175 So.2d 741

## SOUTHEAST ALABAMA GAS DISTRICT et al.

v.

## N. W. KILLINGSWORTH.

### 4 Div. 210.

Supreme Court of Alabama.

Feb. 18, 1965.

Rehearing Denied May 27, 1965.

**49**

Ball & Ball, Montgomery, for Southeast Alabama Gas Dist.

E. C. Orme, Troy, for George F. Wheelock Co.

John W. Gibson and Oliver Brantley, Troy, for appellee.

PER CURIAM.

Appellee recovered judgment in the circuit court of Pike County on a complaint which reads as follows:

"Plaintiff claims of defendants $4,-000.00 for that on, to-wit, March 6, 1962, defendants installed a Limit Control upon a combination air conditioning unit and furnace in Plaintiff's office and clinic building at Brundidge, Pike County, Alabama, Defendants were negligent in and about the installation of said Limit Control and, as a proximate result of said negligence, the air conditioning unit and furnace became overheated and plaintiff's building and furnishings therein were burned and rendered less valuable."

It is to be noted that the negligence charged to defendants arises out of the installation of the Limit Control; that as a proximate result of said alleged negligence two incidents happened, namely, (a) the air conditioning unit and furnace became overheated; (b) plaintiff's building and the furnishings therein were burned and rendered less valuable.

It appears from the evidence that plaintiff was a practicing physician at the time of the fire and since said time; that he owned and operated a clinic in Brundidge, Alabama, for the reception, examination and treatment of patients; that the clinic was the subject of the fire.

This building or clinic when it caught fire was heated with a gas furnace situated in a furnace room that adjoined a laboratory, all in the same building or clinic. It further appears that the heating apparatus was not properly functioning so as to adequately heat the rooms or building.

The defendant, Southeast Alabama Gas District, supplied the natural gas consumed in the heater or furnace to heat the air, while the defendant George F. Wheelock Company sold equipment used in heating systems or installations operated by burning gas.

One Mr. Senn, an agent or servant of the defendant Southeast Alabama Gas District, and a Mr. George F. Wheelock, a sales representative of defendant Wheelock Company, responding to the complaint of plaintiff that his heating facilities in the clinic were not functioning properly, met at the clinic about 11:00 o'clock A.M., and forthwith proceeded to inspect and examine the system, or parts of it, to ascertain the cause of the heat deficiency in the building. No question is here raised as to their authority to act for and represent the defendants as they did.

Following their joint inspections and examinations of the facilities, they concluded that the blower on the bottom of the heater underneath the heat exchange was hanging by one bolt and that the fan used to blow the heated air into the ducts that ramified the building was loose. They proceeded to correct these defects. They also concluded that the limit control switch was not functioning properly and was cutting the heat off too quickly to warm the several offices

in the building to a degree preset by the thermostat control located at a strategic point in the building.

They proceeded to remove the existing limit control switch and install a new one, which is conceded to have been tested and found to be functioning properly, or at least that statement appears in the record before us.

After observing the operation of the heater for a few minutes and being impressed that the furnace or heater supplying the heat for the building was and would function properly and would supply adequate heat, they left the clinic about noon with the furnace or heater burning.

Plaintiff and his wife left the clinic about 12:30 P.M. following the departure of the technicians, Mr. Senn and Mr. Wheelock, and went to lunch, where in about 30 minutes after their departure they received a call informing them that the clinic was on fire. They left immediately for the office.

The heater or furnace was a mechanical device that burned natural gas in a chamber. This particular heater would perform by air blowing over a metal box in which the fire is located. A thermostat located in the building would cut the gas off and on when the heated building would reach a preset temperature, that is, when functioning properly.

The limit control switch was a safety device that was designed to cut off the main flames of gas in the heater or furnace when the heat reached a preset temperature designated by the control switch. When the heat, dispersed through the building for warmth, reached a preset temperature at which the thermostat was fixed, then the thermostat was designed to shut off the heating flames in the furnace, while the limit control switch was designed also to shut off the heating flames in the furnace should the thermostat fail to function to that end. The limit control switch was an additional device to prevent the furnace or heater from overheating.

It is without dispute that the new limit control device that was put in the heater the day of the fire was wired incorrectly at first by Mr. Senn and Mr. Wheelock, but was again rewired, according to the evidence of Mr. Wheelock, in accordance with a diagram furnished with the apparatus. These two witnesses, Mr. Senn and Mr. Wheelock, who assumed the installation of the new limit control switch, both testified that in their opinion the switch was correctly wired to function.

A Mr. Johnson, a witness for the plaintiff, whose experience was adduced by evidence before the jury, testified that; during the afternoon following the fire, he saw the switch and that it was not correctly wired so that it would properly function.

There is no evidence that prior to the departure from the clinic of Mr. Senn and Mr. Wheelock, and of the plaintiff and his wife, there was any uncontrolled fire in the furnace room or the adjoining laboratory.

There was evidence as to the location of the uncontrolled flames after their discovery, and also as to the charred condition of the furnace room and of the laboratory adjacent thereto.

The fire chief testified that after the fire cooled down, he found some charred 2 x 4's where the duct work went through the wall; that the wall above the heater was burned, but nothing lower down was burned; that there was fire in a lot of different places that had to be put out. This was about 1:00 o'clock P.M. Where the wiring came through, the wall, at the location of the electric fuses, was either burned or charred. This witness never did examine the heater.

Counsel for plaintiff during the trial stated to the jury:

"It is agreed that the defendants on the date of the fire removed the limit control and installed this one in the furnace. (indicating) This has been tested by a reputable testing laboratory and so far as the device is concerned, it has no defect."

The following testimony was adduced:

(Mr. Johnson, testifying as a witness for plaintiff)

"Q. Tell the jury where this limit control is situated on the gas furnace?

"A. It is located in the top of the heater, in the top of the furnace.

"Q. That is where the hot air leaves the furnace?

"A. Where it picks up heat from the furnace should it over heat.

"Q. That is generally the hottest part, where the air is the hottest?

"A. Right.

"Q. What is the purpose of this limit control?

"A. It is a safety to shut the unit off if it gets too hot.

"Q. A certain temperature of that air, a critical point, it would shut the furnace off?

"A. Right.

"Q. Does it also shut off the thermostat?

"A. It makes the heater completely inoperative, that is, regardless of what the thermostat is doing it makes the heater completely inoperative so, I guess you would say it cuts off the thermostat too.

"Q. If you have your thermostat set for a comfortable temperature say 70 or 75 and your furnace has plenty of B T U's but is not reaching that goal temperature before the limit switch cuts off, what does that indicate? If your limit switch is working before your normal room temperature is reached?

"A. Normally that would indicate that for some reason that the heat wasn't getting to the rooms which would indicate normally not enough air going over the furnace.

"Q. Not enough outlets through the duct work and the heat building up in the furnace, is that it?

"A. Yes.

"Q. And that is the purpose of this that when this happens to cut it off before the heat in the furnace reaches the critical point?

"A. Yes, sir.

"Q. Tell the jury, please sir, will this limit switch work and operate wired as you have described it to them?

"A. No.

"Q. It is inoperative?

"A. It will not operate.

"Q. You mean it wouldn't cut it off no matter how hot it would get?

"A. It would operate but the operation wouldn't affect the operation of the furnace. The switch itself would operate but it is wired so that it would not shut the furnace off.

"Q. It would not do the one thing it is supposed to do?

"A. That's right."

Plaintiff testified that he had been having trouble with the heater not heating the building sufficiently; that when he arrived on the scene he found that the fire was in the furnace room and the smoke was out in the halls and coming out every duct in each room; that the fire was burning in the furnace room and in the adjacent laboratory room next to the furnace room; that after the fire he saw evidence of more fire in the furnace room; that the ceiling in the furnace room was charred. Witness testified on cross examination that all the main switches for the electrical system in the building were in the furnace room on the east wall; there was a wire and switch on the north wall that activated the furnace.

On redirect examination, plaintiff testified as follows:

"Q. Doctor, did you have an occasion to observe these charred parts after the fire was put out?

"A. Yes, sir.

"Q. Where was the deepest part where it was charred?

"A. I would say the whole ceiling above the central part of the room.

"Q. That would be right above the heater?

"A. Yes, sir.

"Q. What was the condition of the duct work from the heater or furnace going into the other duct work?

"A. Of course, the insulation was burned, paper and stuff like that, and water—what wasn't' burned off was washed off. As far as the tin and duct work, it was not necessarily burned in two or melted, I don't think. It might have been, I can't really answer that question.

"Q. Did you notice the duct work from the air conditioner into the main line, was it damaged in any way?

"A. I am not sure. I just know the front part of the air conditioner was melted.

"Q. That is the front part that faces the heater?

"A. Yes, sir, that is above the level of the heater.

"Q. Were the bearing melted in the air conditioner?

"A. Yes.

"Q. And it also faced the heater?

"A. Yes."

Each appellant (defendant below) here insists by appropriate assignments of error that the trial court committed error to reverse in refusing to give a written charge for each defendant, with and without hypothesis, that the jury should not find for the plaintiff, and that it return a verdict for defendants. The contention is that plaintiff was not entitled under the evidence to a verdict against the defendants.

In support of this contention, each appellant relies upon an adjudication by this court in the case of McClinton v. McClinton, 258 Ala. 542, 544–545, 63 So.2d 594(2), 596–597, wherein we approved a principle of law cited in Southern Ry. Co. v. Dickson, 211 Ala. 481, 100 So. 665, 669, as follows:

"As this court has often declared, findings of fact based on conjecture merely cannot be upheld. Southworth, Adm'x v. Shea, 131 Ala. 419, 30 So. 774; Miller-Brent Lumber Co. v. Douglas, 167 Ala. 286, 52 So. 414; John v. Birmingham Realty Co., 172 Ala. 603, 55 So. 801; Carlisle v. Central of Georgia Ry. Co., 183 Ala. 195, 62 So. 759; Dorman's Case [St. Louis & S. F. R. Co. v. Dorman, 205 Ala. 609, 89 So. ⁄70], supra. As said in Southworth, Adm'x v. Shea:

" 'Proof which goes no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause.'

"But a nice discrimination must be exercised in the application of this principle. As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only. On the other hand, if there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect then there is a juridical basis for such a determination, notwithstanding the existence of other

plausible theories with or without support in the evidence."

The same principle of law appears in the case of Griffin Lumber Company v. Harper, 247 Ala. 616, 621, 25 So.2d 505(8, 9).

But does the evidence in the case at bar point to one theory of causation indicating a logical sequence of cause and effect, so that we may say the evidence has selective application to the theory of causation alleged in the complaint? If so, the written charges refused by the court, directing a verdict for each defendant, with or without hypothesis, and here assigned by each appellant as error, were properly refused, and the factual issues as to cause and effect presented by the evidence were properly submitted to the jury.

It is without dispute from the evidence that the heating system installed in the clinic was immediately before the fire malfunctioning and not disseminating enough heat to the areas of the building served by a duct system for transmission of heat generated by the gas furnace; that defendants' lawful agents, in an effort to correct the malfunction, came to the building about 11:00 o'clock A.M. on the day of the fire, and proceeded immediately to make mechanical adjustments inside the furnace where the heat for warming the building was generated by burning gas jets; that after these adjustments were made, these agents, through their joint efforts and supervision, proceeded to remove a limit switch control and install a new one that was in good working order. We think it can be fairly deduced from the evidence that the control switch when properly installed was calculated to function as a last minute control and safety device to prevent the furnace, where the gas fire is located to generate heat for distribution by duct system throughout the building, from overheating, and begins to operate in its protective capacity when the gas is not cut off by a thermostat control located in a central area of the building outside the furnace room.

There was testimony by a witness, a Mr. Thompson, for plaintiff, that on his examination of the furnace and of the control switch installed by the agents of appellants during the afternoon of the fire he found the switch was incorrectly wired with electric wires attached thereto. This faulty wiring he pointed out to Mr. Senn, who helped do the wiring along with Mr. Wheelock. This witness further testified that the switch as wired would not operate.

There was also evidence as we have observed as to the charred condition of the furnace room which caught on fire along with the adjacent laboratory space. Some of this charred condition in the furnace room was located in proximity to the heater or furnace, while other charred areas were near the electrical switches located on the wall of the furnace room. Fire also burned areas in the laboratory space adjacent to the furnace room. So far as we recall from our examination of the evidence, the text of which we have read more than once, there was no testimony of any combustible or flammable chemicals or kindred articles located in the laboratory space, so that it could be said that the fire might have started from combustible or flammable ignition of chemicals or kindred substances.

We are not unmindful that defendants offered testimony by Mr. Senn and Mr. Wheelock that, in wiring the control switch the last time, they followed a diagram or chart identified for use in installing the limit control switch and that the wiring was correctly done. This testimony, contradicted by Mr. Thompson, presented a jury question as to whether or not the wiring was properly done.

It further appears from the evidence that the fire originated sometime between the time that appellants' agents left the building around 12:00 or 12:15 at noon, and about 1:00 o'clock P.M., when plaintiff while at lunch was notified that his clinic was on fire. There is no evidence of any uncontrolled fire in the building before Mr. Senn and Mr. Wheelock worked on the fur-

nace and installed the control switch. There is no direct evidence as to how the uncontrolled fire originated, nor any direct evidence supporting any theory advanced by appellants as to the origin of the fire. A theory that the fire may have started in the laboratory room is not supported by any reasonable deduction from the evidence.

As we have pointed out, the complaint filed in this cause, which stands unchallenged by demurrer here for consideration or review, alleges negligent installation of the limit control switch, and as a proximate consequence (of such negligent installation) the furnace overheated *and* plaintiff's building and furnishings were burned and rendered less valuable. The complaint does not confine the proximate result of the alleged negligence to a fire that originated from the overheated furnace but connects the fire with the negligent installation of the limit control switch, whether through the alleged overheating of the heater or furnace, or through the faulty electrical wiring of the switch in its installation. The complaint does not say that the negligent installation of the limit control switch overheated the furnace *from which* (overheating) plaintiff's building and furnishings were burned and rendered less valuable, but plainly avers that plaintiff's building was burned as a proximate result of the negligent installation, whether due to overheating of the furnace or otherwise as a causal result of the negligent installation.

So, under the evidence, it was up to the jury to say whether or not the origin of the fire was from the electrical system installed in the furnace room, which in turn was activated to communicate fire to the wall of the room where located due to the faulty wiring, if such be a fact, installed by the agents in the control switch, or through excessive heat generated in the gas furnace that failed to adjust and cut off because not properly wired by Mr. Senn and Mr. Wheelock.

While there was some evidence as to the mechanical operation of the heater or fur-

nace, so that no excessive heat would or did generate in the furnace under the operating conditions of the heating system on the occasion of the fire, we think from our study of the record before us and the evidence adduced, it was up to the jury to say whether or not the fire was caused by the alleged faulty wiring of the control switch or through excessive heat generated in the gas furnace that failed to adjust and cut off because the control switch was negligently installed and improperly wired.

The evidence justified the trial court in submitting the controversial factual issues to the jury for sifting and resolution as to truth. The jury resolved the issues raised by the complaint in favor of the plaintiff. We are not disposed to disturb. The judgment is affirmed.

The foregoing opinion was prepared by B. W. Simmons, Supernumerary Circuit Judge, and was adopted by the court as its opinion.

Affirmed.

LAWSON, GOODWYN, MERRILL, and COLEMAN, JJ., concur.

ON REHEARING

PER CURIAM.

We inadvertently overlooked specifically addressing any judicial observation to each defendant's motion for a new trial. Each motion contains a ground that the verdict of the jury and the judgment entered thereon is contrary to the great weight and preponderance of the evidence in the case.

On reconsideration and review of the evidence, we hold this ground, asserted by each appellant, is without merit. There was no error on the part of the trial court in overruling both motions.

Where we referred in our opinion to a Mr. Thompson as a witness for plaintiff,

we should have said Mr. Johnson. This misnomer stands corrected.

Opinion extended and application for rehearing is overruled.

LAWSON, GOODWYN, MERRILL and COLEMAN, JJ., concur.