Shelia Jane JOHNSON et al., Plaintiffs,

v.

Donald Lee KNIGHT, doing business as Knight Electric Company, and Knight Electric Co., Inc., Defendants.

No. EC 76–24–K.

United States District Court,
N. D. Mississippi, E. D.

Nov. 9, 1978.

Claude A. Chamberlin, D. W. Houston, Jr., Aberdeen, Miss., Arthur Fite, Hamilton, Ala., for plaintiffs.

Douglas C. Stone, Thomas L. Segrest, Columbus, Miss., for defendants.

## MEMORANDUM OF DECISION

KEADY, Chief Judge.

In this diversity action, plaintiffs Shelia Jane (Johnson) Rowland, Bobby Max Satterfield and Sharon Denise (Lacey) Byrd and their parents, Wendell S. Satterfield and Marilyn Satterfield, citizens of Marion County, Alabama, sue defendants Donald Lee Knight, d/b/a Knight Electric Company (Knight), and Knight Electric Company, Inc. (Knight Company), citizens of Monroe County, Mississippi, for negligence and breach of warranty in installing an allegedly defective electrical system which plaintiffs claim caused the total loss by fire of plaintiffs' residence located near Detroit, Alabama, and practically all contents therein situated. The three Satterfield children sue as owners of the residence, which they assert had a market value of $160,000 on December 25, 1975, the date of the fire; the parents, owners of the furniture and furnishings within the residence, seek the recovery of $23,964 as the fair value of the contents loss.

The defendants admitted that Knight, prior to incorporating his business on October 8, 1975, contracted for and installed the electrical system in the plaintiffs' residence and admitted that it and the furniture therein situated were totally destroyed by fire, but they denied that they were negligent in the installation and servicing of the electrical system or that they improperly performed the work; furthermore, they de-

nied that the fire was caused by defects in the wiring system.

In pretrial conference before the U. S. Magistrate, plaintiffs took the position that the defendants negligently installed # 12 wire which led across wooden beams in the loft of a large living room of the house to connect with three chandeliers hung from the beams, with each fixture equipped to burn 24 40-watt bulbs; that the residence was wired for 120 voltage current; that # 12 wire was too small to pull such a load on one circuit; and, moreover, that the wires connected to the chandeliers spanned too great a distance from the circuit breaker to be safe and were tied into a circuit breaker that was improperly installed for the purpose, thereby creating an unreasonably dangerous condition which caused the fire. Defendants contend that their installation and servicing of the electrical system were done in a proper and workmanlike manner without negligence or breach of warranty on their part and asserted that the plaintiffs' losses were sustained by a fire of unknown origin.

In a nonjury trial, both parties presented live testimony from lay and expert witnesses, documentary exhibits and depositions of appraisers. The court, having called for and received legal memoranda, incorporates in this opinion findings of fact and conclusions of law as required by Rule 52, F.R. Civ.P.

## I. FACTS

Mr. and Mrs. Satterfield, in 1972, deeded a 40-acre tract of land to their children, the other plaintiffs, for a family homestead; and the entire Satterfield family proceeded to erect, in stages extending over several years, a large residence, which contained 6,620 square feet. It was a two-story structure with a basement. The ground floor principally comprised kitchen, breakfast and dining room areas, a library and a large living room approximately 40 feet wide and 70 feet long, with a fireplace erected at one end of the room. At the opposite end, stairs went up to the second level forming a balcony which led to four bedrooms.

The downstairs living room had a vaulted roof which rose 30 feet from the floor; spanning this open area at the second floor level were 30 rough-sawed wooden beams 12″ thick and spaced 30″ apart. At the center of three of the beams were hung heavy, wagon-wheel chandeliers; each of these fixtures was six feet in diameter and bolted into the underside of the beam. The various stages of the construction had been directed by Mr. Satterfield, a mobile home manufacturer, who himself bought much of the material which went into the house and supervised the workmen who subcontracted different jobs. Sometime during 1974, Satterfield contacted the defendants, who had an office at Amory, Mississippi, and engaged them to do the electrical wiring. Under their verbal agreement, Satterfield procured some materials, such as switches, panel boxes, circuit breakers and all of the light fixtures. Defendant Knight furnished all labor, working on a time and material basis, for he also supplied some of the wire, panels and multibreakers used on the job.

Knight installed in the basement two 200 ampere panels which tied into a number of 20 ampere circuits; he also installed a 100 ampere panel in an upstairs closet which connected with 20 ampere circuits. There is a dispute in the evidence as to which multibreaker controlled the circuit for the chandelier lights. Knight testified that the upstairs multibreaker controlled that circuit, while Satterfield contended that the chandelier lights were controlled by the basement multibreaker. In any case, Knight used one circuit for all three lights with # 12 wire which was stapled on the topside of the three beams. At the location of each fixture, knight drilled a hole through the wooden beam and inserted the wire downward to join the fixture, which was nailed to the underside of the beam. The wire passing through the beams was not placed in conduits, and despite Knight's contrary testimony, no junction boxes were used at the point of connection with the chandeliers. The basement multibreaker was 100 feet distant from the chandeliers.

In the fall of 1975 the house was substantially completed, the Satterfield family moved in, and about December 1 they began to experience trouble with the chandelier lights going off. When this occurred, Satterfield went to the basement, where he found the multibreaker open and kicked it on to make the chandelier lights become operative. After the chandelier lights went off a number of times, Satterfield complained to Knight. One of the defendants' servicemen, a Mr. Westbrook, during the early part of December worked on the multibreaker located in the basement. Westbrook told Satterfield that he had removed the 20 ampere breaker and installed a 60 amp fuse temporarily until he could change it to proper size. A month later, after the fire, Knight told Satterfield that Westbrook had reportedly installed a "split-30" ampere breaker, or connected two 30 ampere breakers to the same circuit. In any case, after this work was done by Westbrook, no further difficulties were encountered with the chandelier lights going off. Satterfield stated that he never had any difficulty with the upstairs multibreaker. The court finds as a fact that despite Knight's testimony, the basement multibreaker controlled the circuit for the chandelier lights; moreover, the 20 amp fuse originally installed for that multibreaker was removed by Westbrook, who placed larger size fuses of 30 amperes to prevent the chandelier lights from going off.

On December 24, the Satterfield family was occupying the residence, they had a fire in the fireplace some hours earlier in the day but not at night, and the family members were busy preparing for the Christmas holiday. The chandelier lights had been on for a number of hours during that day and night. Except for Shelia Jane, who was away from home at the time, Mrs. Satterfield was the last of the family to retire. Upon entering the upstairs master bedroom at 1:30 a.m., she cut off the chandelier lights and went to bed. She was awakened about 2 a.m. by a popping, or cracking noise. Sensing that something was wrong, she went to the bedroom door and saw a flame six to eight inches high extending along the topside of the beam from where the chandelier was hung to where the beam joined the wall. Mrs. Satterfield turned on the switch controlling the chandeliers and all lights came on. This particular beam on which she noticed fire was the one nearest the fireplace and further from the switch and downstairs multibreaker than the other chandeliers. She detected no odor from the blaze nor fire at any other place in the house, but awakened her husband and other members of the household, who confirmed that the fire was first seen on the beam holding the chandelier nearest the fireplace. The fire quickly spread through the upper portion of the house, and the entire structure was soon engulfed in flames. The Satterfields were able to save only a few articles of furniture.

The undisputed evidence is that the spacious Satterfield home had fair market value of $160,000 as of the date of the fire, and the furniture and contents loss amounted to $23,964. Satterfield neglected to procure permanent insurance after the builder's risk coverage expired on December 1, 1975.

The uncontradicted proof also is that defendants installed # 12 wire to wire the chandelier circuit, and the National Electric Code specified a maximum of 20 amps to be pulled by wire of that size. With 120 voltage household current, each chandelier held 24 40-watt bulbs which pulled 960 watts on each fixture, or a total of 2880 watts for the three chandeliers. This wattage on one circuit therefore pulled 24 amperes, or four amperes in excess of the maximum allowed by the code. Knight denied that the fixtures were overloaded, testifying that each chandelier had no more than 7 bulb positions for 60-watt bulbs. The testimony of Satterfield, his wife and son that each chandelier held 24 bulbs, and that 40-watt bulbs were inserted, is more credible. Mrs. Satterfield selected the fixtures, her husband ordered them directly from a supply house, and their knowledge of the chandeliers is more trustworthy and accurate than Knight's uncorroborated recollection. The court finds as a fact that Knight installed wire of a size not recommended to pull

more than 20 amperes and connected it to the chandelier fixtures with a combined load of 24 amperes. Also, Knight failed to enclose the wires with conduits where the 12 inch holes were drilled through the wooden beams, nor did he install junction or outlet boxes to connect with the chandeliers; these omissions violated other provisions of the National Electric Code.

Expert testimony was presented by both sides. J. W. King, an experienced electrician from Hamilton, Alabama, testified for plaintiffs that the National Electric Code was in effect in Alabama during 1975; he was of the opinion that 24 amperes [1] pulled through # 12 wire, rated for 20 amperes, 100 feet away from a multibreaker equipped with "split-30" fuses, was hazardous. He expressed the view that the longer the wire, the more the voltage drops, thus making heat rise in the wire. His conclusion was that, without conduit or a junction box in the hole-drilled beam, the wire likely ignited within the hole, and upon being exposed to air, burst into flame which spread along the topside beam to which the wire was stapled. He also testified that using two 30 amp fuses would increase the ampere capacity of the circuit breaker beyond that which could be safely conducted by # 12 wire. On cross-examination, King stated that the purpose of the multibreaker was to protect against overload although increasing its size would not cause the amperes to rise; only the load of the light fixtures would cause amperes to increase. He conceded, however, that if the full load of 24 amperes was fed through junction boxes from which a separate wire ran to each of the chandeliers, no more than one-third of the total load, or about 8 amperes, could be pulled by a single chandelier, and that 8 amperes would not make # 12 wire hot enough to ignite. King nevertheless stood by his opinion that the wiring system was unsafe because of the length of time the chandeliers had been on, the size and length of the wire from the downstairs multibreaker to the chandeliers, the absence of proper conduit, or casing, in the beam

hole and of a junction box at the fixture's connection, and particularly the oversized fuses used; and that these conditions were capable of causing a fire. Furthermore, King explained that the fact that the chandelier lights came on when Mrs. Satterfield pulled the switch, after observing the fire, was evidence that the circuit had not been broken by the oversized "split-30" configuration.

Defendants offered two expert witnesses, Donald F. Fitzgerald, Professor of Electrical Engineering at Mississippi State University, and Damon Wall, Professor of Electrical Engineering at the University of Mississippi. Both of these experts agreed that # 12 wire is rated by the National Electric Code for no more than 20 amperes, yet a total 24 ampere load, in their opinion, would not appreciably raise the temperature in the wire, or overload the wire to the point of ignition. Each also agreed that, regardless of whether the chandelier circuit was tied into the downstairs multibreaker, or the multibreaker in the upstairs closet, the wire leading to each chandelier, under normal conditions, should have no more than 8 amperes; and they were further in agreement that the size of the multibreaker, whether a "split-30", or whatever size fuse, would not increase the voltage, the sole purpose of a multibreaker being to kill the electricity in case of an overload or short circuit.

Fitzgerald disputed King's opinion that the length of the wire from the downstairs multibreaker was a contributing factor. He stated the resistance factor, if # 12 copper wire were used, would be 1.5880, as prescribed in standard tables; that if 24 amperes were carried in a wire 100 feet long, the total drop would be 8.6 volts, which if distributed over 100 feet of line would dissipate heat at the rate of one watt per foot of wire. Fitzgerald stated this should cause only a small rise in the wire's temperature. According to Fitzgerald, the absence of a junction box, a protective cover on the underside of the beam where the chandeliers were attached, would generate only a small amount of heat in the wire,

1. King, during his testimony, miscalculated the peak load of the chandeliers as 22.4 amperes.

and, with no more than 8 amperes flowing through the wire, would not cause a fire. He further stated that a margin of safety was built into the code wire ratings, and that he had conducted experiments by passing 40 amperes through a # 12 wire and, after an hour, found the wire barely warm to the touch. He therefore concluded that a full load of 24 amperes, had all three chandeliers been on a single load, could not possibly cause # 12 wire to burn. Fitzgerald pointed out that if the wire did ignite, the burning insulation would have caused a detectable odor, which had not been noticed by plaintiffs.

Wall's opinions were in general agreement with those of Fitzgerald that the fire was not caused by overload of the chandelier circuit. He also expressed the opinion that if one chandelier wire had ignited, its insulation would probably have been destroyed, causing a short circuit which would make the breaker open as soon as the light switch was thrown. Wall necessarily reasoned that, given the proper size multibreaker, a burning wire would probably have prevented the chandelier lights from coming on as Mrs. Satterfield testified they did when she turned on the switch. This expert conceded that if the chandelier lights had kept going off before the day of the fire, that would indicate that the breaker for the chandelier circuit was overloaded. It is reasonably deducible from the testimony of the experts that an oversize multibreaker would fail to function in case of a short circuit or ampere overload which did not exceed the breaker's capacity, which in this case exceeded 30 amperes. Westbrook was deceased at time of trial and thus no explanation was made of how he rigged the chandelier multibreaker by using 30 amp fuses.

## II. APPLICABLE LAW

■ At the outset of the case, the court inquired whether the substantive law of Alabama or of Mississippi governed. Counsel have correctly briefed the case on the theory that Alabama law is controlling. The choice of law, in federal diversity cases,

is determined by conflict of law principles recognized by the forum state. If this case is viewed as one arising out of contract, or the negligent performance thereof, Mississippi is in accord with the general rule that where a contract is made in one state and is wholly performed in another, the law of the latter jurisdiction applies. *Shannon v. Georgia State Building & Loan Ass'n,* 78 Miss. 955, 30 So. 51, 54–55 (1901); *National Mutual Building & Loan Ass'n v. Brahan,* 80 Miss. 407, 31 So. 840, 843 (1902); *First National Life Ins. Co. v. Fidelity & Deposit Company of Maryland,* 525 F.2d 966, 967 (5 Cir. 1976) (applying Alabama's place-of-performance rule); 16 Am.Jur.2d, Conflict of Laws, § 40, 62–63. Here, although the contract for the electrical wiring was entered into in Mississippi, it was wholly performed in Alabama. Alternatively, should the action be considered one ex delicto, solely sounding in tort, Alabama law would equally apply, since the alleged tortious acts and injury occurred in that jurisdiction. *New Orleans & N. E. R. Co., v. Scogin,* 243 Miss. 1, 137 So.2d 539 (1962); *Browning v. Schackelford,* 196 So.2d 365 (Miss.1967).

■ In contracts for work or services, Alabama law imposes upon the contractor an implied duty to perform the work "with that degree of skill or workmanship which is possessed by those of ordinary skill in the particular trade for which one is employed. *Sherrill v. Alabama Appliance Co.,* 240 Ala. 46, 197 So. 1." *C. P. Robbins & Associates v. Stevens,* 53 Ala.App. 432, 301 So.2d 196, 199 (1974). In the *Robbins* case, a failure of the contractor's assurance to follow building plans and to do the work in a good and workmanlike manner was held to constitute a breach of warranty.

The Alabama cases also hold that in every case based upon actionable negligence, "there are three essential elements to a right of recovery: First, a duty owing from defendant to the plaintiff; second, a breach of that duty; and third, an injury to the plaintiff in consequence of that breach." *Stokely-Van Camp, Inc. v. Ferguson,* 271 Ala. 120, 122 So.2d 356, 358 (1959); *Malone Freight Lines, Inc. v. McCardle,* 277 Ala.

100, 167 So.2d 274, 276 (1964). The Fifth Circuit, in *Spurlin v. General Motors Corp.*, 528 F.2d 612 (1976), applying Alabama law, restated the definition by setting forth four elements necessary for recovery in a negligence action: "(1) [t]he existence of a duty on the part of the defendant; (2) a breach of that duty; (3) the existence of a causal relationship between the defendant's conduct and the plaintiff's injury; and (4) resulting injury to the plaintiff." p. 615. It is interesting to note that the Court of Appeals cited *Ward v. Hobart Manufacturing Company*, 450 F.2d 1176 (5 Cir. 1971), construing Mississippi law, in support of the stated definition. This confirms our belief and that of counsel in the case at bar that there is no great difference between the substantive negligence law of Alabama and Mississippi.

In Alabama, however, the rule as to burden of proof upon a plaintiff is a somewhat different standard than Mississippi's requirement of establishing facts by a preponderance of evidence. The measure of proof required in Alabama is "belief of fact to the reasonable satisfaction of the jury [or trier of fact].[2] *American Lumber & Export Co. v. Love, Sheriff et al.*, 17 Ala.App. 251, 84 So. 559, 560 (1919); *Arndt v. City of Cullman*, 132 Ala. 540, 31 So. 478, 480 (1902). It is well settled in federal diversity cases that the local law controls issues of burden of proof. *Transammonia Export Corp. v. Conserv, Inc.*, 554 F.2d 719 (5 Cir. 1977); *Palmer v. Hoffman*, 318 U.S. 109, 117, 63 S.Ct. 477, 87 L.Ed. 645, rehearing den'd 318 U.S. 800, 63 S.Ct. 757, 87 L.Ed. 1163 (1943).

In the instant case, the defendants unquestionably owed a duty to plaintiffs, whether stated in terms of warranty or of the ordinary care and skill required of a prudent contractor; and this duty was breached by not complying with pertinent requirements of the National Electric Code by (1) using # 12 wire to pull 24, rather than 20, amperes on the chandelier circuit,

(2) failing to enclose the wire going through the beam within a conduit or other approved casing, and (3) failing to install junction boxes at the connections with the chandelier fixtures. Additionally, the frequent opening of the downstairs multibreaker, when equipped with a 20 ampere fuse, was indicative of poor workmanship to provide reliable lighting for the chandeliers; and Westbrook's increasing the size of the multibreaker fuse to two 30 ampere fuses made it impossible to shut off the overload on the # 12 wire or to close off the electricity in case of a short circuit. We have no hesitation in holding that the defendants were negligent in these particulars. Nor can there be any doubt as to the very substantial property losses sustained by the plaintiffs.

The crux in the case is whether plaintiffs have, to our reasonable satisfaction as the trier of fact, shown a causal relationship between the defendants' dereliction of duty and the plaintiffs' loss. Stated simply, have plaintiffs shown that the fire was caused by the manner in which the defendants wired the residence? Plaintiffs concede there is no direct evidence as to the cause of the fire, and their case must stand or fall upon the sufficiency of the circumstantial evidence. Plaintiffs contend that proof of the circumstances surrounding and preceding the fire indicates a logical sequence of cause and effect vis-a-vis defendants' wiring installation and the fire, and that no other plausible explanation for the origin of the fire has been shown to have existed. Defendants maintain that, although causation may be shown circumstantially, the weight of the testimony, including that of plaintiffs' expert Mr. King, shows the fire could not have been caused by an electrical overload or other acts in wiring the house for which defendants are responsible. The resolution of this case hinges altogether upon how this issue should be decided.

Plaintiffs cite three Alabama cases, *Southern Railway Company v. Dickson*, 211

---

**2.** Alabama, unlike Mississippi, also recognizes that a scintilla of evidence is sufficient to submit any factual issue to the jury. *Ridgeway v.*

*Sullivan-Long & Hagerty, Inc.*, 39 Ala.App. 341, 98 So.2d 665, 669 (1957). *Cf. Harpole v. Harrison*, 279 So.2d 150, 153 (Miss.1973).

Ala. 481, 100 So. 665, 669 (1924), *Griffin Lumber Company v. Harper*, 247 Ala. 616, 25 So.2d 505, 508–9 (1946), *Southeast Alabama Gas District v. Killingsworth*, 278 Ala. 48, 175 So.2d 741, 745 (1965), in support of their reliance upon circumstantial evidence as a basis for recovery. Alabama has consistently followed the principle first announced in *Southern Railway Company, supra* :

> Proof, which goes no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause.

> But a nice discrimination must be exercised in the application of this principle. As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only. On the other hand, if there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence.

100 So. at 669.

■ Circumstantial evidence was sufficient to uphold jury verdicts in *Southern Railway Co.* and *Killingsworth*, but legally inadequate in *Griffin Lumber Co.*, as well as a Fifth Circuit decision, *Green v. Reynolds Metals Co.*, 328 F.2d 372 (5 Cir. 1964), which applied Alabama law and is cited by defendants. A close examination of these cases reveals that the result turned upon the particular facts of each case, when tested by the guiding principles that the plaintiff is bound to remove the issue of proximate cause from the realm of speculation by proof of facts affording a reasonable basis for inferences which he asserts, and that the evidence must point to a reasonable likelihood of probability, rather than possibility, favoring plaintiff.

In *Southern Ry. Co. v. Dickson, supra*, a switchman-plaintiff in a Federal Employers' Liability suit recovered for injuries sustained by falling from the train due to a sudden and violent jerk to the cars while the plaintiff was serving at his post of duty on one of the hindmost cars. The court concluded that, while opinions might differ, the testimony of the plaintiff and his fellow employees, including the engineer, was sufficient to support a finding that the negligent operation of the train caused the injury-producing fall. In *Killingsworth*, recovery was upheld for property damage caused by fire which occurred about one hour after the defendants' agents had changed a switch controlling a gas furnace to eliminate prior malfunctioning. The purpose of the control switch was to prevent the furnace from overheating when gas flow was not shut off by a thermostat control located in a central area of the building outside the furnace room. The origin of the fire was shown to be in the furnace room, the ceiling of which, just above the heater, was deeply charred. There were no combustible or flammable chemicals in the building which could have caused the fire. There was conflicting expert testimony as to whether the control switch was correctly wired and whether the gas heater was capable of generating excessive heat to cause a fire. The jury verdict was upheld on the issue of causation.

On the other hand, circumstantial evidence was inadequate as a matter of law for recovery in a death case of a guest passenger, which required proof of wantonness to establish liability, where the truck in which the deceased was riding ran off the highway into a ditch. There were no eyewitnesses since the truck driver was also killed. There was proof that the truck struck the curb wall with great force after coming down a hill. Plaintiff argued that the great force of the impact was a basis for inferring excessive speed and wanton-

ness on the part of the truck driver. Rejecting this contention, the court held:

> The proof in this case, in our opinion, goes no further than to show that the force with which the truck hit the curb wall could have been caused by defendants' truck driver driving at an excessive rate of speed. But we do not think that the proof warrants the conclusion that it did so occur, since from the same proof the force of the impact can with equal probability be attributed to mechanical failure of the truck. As we view the evidence, it is without selective application to either of the theories of causation and, therefore, they remain conjectures only. The evidence does not point to any one theory of causation indicating a logical sequence of cause and effect. We conclude, therefore that the fact that the truck hit the curb with terrific force does not justify a reasonable inference that the truck was being driven at an excessive rate of speed.

25 So.2d at 509.

In *Green v. Reynolds Metals Co., supra,* an opinion authored by District Judge Frank Johnson, recovery was denied for personal injuries to a workman who fell from the roof of defendant's plant. Plaintiff contended that defendant had negligently allowed a large amount of dust to accumulate on the unguarded ledge from which he fell. No one saw the plaintiff fall, and the plaintiff, who suffered retrograde amnesia by reason of the fall, testified that he did not know what caused the fall; the last thing he remembered was removing his dust respirator. From undisputed evidence, the working conditions on the roof were generally in the same condition which the plaintiff had observed during his thirteen weeks on the job. The court stated:

> There was no evidence presented in this case that indicated what caused Green to fall. There was not as much dust on the ledge as usually accumulated. In any event, there was no showing that the dust or debris on the ledge had anything to do with the fall. To base a finding of negligence on the fact that excessive dust was allowed to accumulate and that Green fell as a proximate cause of such condition would, in the first place, be contrary to all the evidence, and, in the second place, be entirely speculative and conjectural.

328 F.2d at 374.

■ The *Killingsworth* decision, strongly relied upon by plaintiffs, is not without force as it illustrates that "Proximate cause is a mixed question of law and fact for the jury [or trier of fact]," *Underwood v. Smith,* 261 Ala. 181, 73 So.2d 717, 725 (1954), citing 65 C.J.S. Negligence § 264, pp. 1183–1185:

The *Underwood* court stated:

> It [proximate cause] "is not a question of science or of legal knowledge, but is to be determined as a fact in view of the circumstances, and from a consideration of all the attending facts and circumstances, and in the exercise of practical common sense rather than by the application of abstract definitions." 65 C.J.S. Negligence § 264, p. 1187, notes 81–83. It is a juridical question, not one of expert knowledge. It involves many factors not of an expert nature, some are legal and some factual.

■ The circumstantial evidence in the case sub judice suffices to raise a substantial issue of fact on proximate causation and presents us, as the trier of fact, with the problem of weighing all of the evidence, including the testimony of both lay and expert witnesses, in resolving the disputes shown by the proof. In view of the conflicting testimony of the expert witnesses offered by the parties and being mindful of the prestigious credentials of the two experts offered by the defendants, the case on its facts is a close one which makes our decision a difficult, if not perplexing, choice of reasonable inferences. We have concluded, however, that there are certain circumstances which point to a fire originating within the electrical system, although the precise defects within the system which caused the fire cannot be pinpointed with absolute certainty. The factors which persuade us that the defendants' manner of

installing the electrical system caused a fire to result include the following cogent circumstances: Defendants used # 12 wire for the chandelier circuit which carried an ampere load greater than that prescribed by the National Electric Code; an oversized multibreaker, installed by defendants' agent to control the chandelier circuit, nullified the intended safety effect of the multibreaker in the event of a short-circuit or excessive overload within the circuit which was already vulnerable to excessive heat; the absence of conduits and of junction boxes at the point where the chandeliers were attached made it possible for heat to generate from the wire in close proximity to the wooden beam; the chandelier lights burned for long hours during the day and past midnight, which probably increased the heat within the overall circuit wired with # 12 wire; the crackling or popping sound which occurred frequently accompanies an electrical disturbance; the fire undeniably originated on the top side of a wooden beam, 20 feet from the floor, where only the # 12 wire was located; there was no evidence of fire in any other part of the living room; and finally, that the chandelier lights did turn on even after the fire was discovered strongly indicates that the overload, short-circuit or whatever specific cause of ignition, had not tripped, or exceeded the capacity of, the oversized multibreaker. Moreover, defendants were unable to advance any other reason or explanation for the fire in the light of the foregoing circumstances. Thus, the evidence is not without selective application of cause and effect, and points to the conclusion that the wiring system caused the fire. As in the *Killingsworth* case, the circumstances are sufficiently strong to outweigh expert opinion that defendants' methods of installing the electrical system could not be responsible for the fire. Therefore, we are reasonably satisfied, as the trier of fact, that the wiring installation by defendants did cause the fire, and we are satisfied that this conclusion is one which may be reached through a logical sequence of cause and effect and without resort to conjecture or speculation.

Let judgment enter accordingly.