**Billy CANIPE, Plaintiff,**

v.

**NATIONAL LOSS CONTROL SERVICE CORPORATION, Defendant.**

**Civ. A. No. DC 81–192–WK–O.**

United States District Court,
N.D. Mississippi,
Delta Division.

May 27, 1983.

capital construction and Zoological funds.

John H. Cocke, Merkel & Cocke, Clarksdale, for plaintiff.

Walter W. Thompson, Luckett, Luckett, Luckett & Thompson, Clarksdale, for defendant.

## MEMORANDUM OPINION

KEADY, District Judge.

In this diversity action, plaintiff, Billy Canipe, a Tennessee citizen, sues National Loss Control Service Corporation (NATLS-

CO), an Illinois corporation qualified to do business in Mississippi, for personal injuries allegedly suffered as a result of NATLS-CO's negligence and breach of contract. The court has before it defendant's motion for summary judgment.[1]

Plaintiff was an employee of the Kraft-Humko plant in Memphis, Tennessee, where he was the operator of a machine known as a flake roll machine. As a part of his job duties, plaintiff was required to perform a clean out procedure on the flake roll machine that required him to lift a plastic dust cover and clean material from the machine's auger trough when converting from one product to another. This procedure required plaintiff to place his hand into the auger trough and, using an air hose, to blow the product down to the bottom of the trough. Plaintiff alleges that the procedure which he had been taught allowed him to clean the trough while the auger was in motion. On the date of his injury, the plaintiff was cleaning the auger trough when his shirt sleeve caught on a large pin on the end of the auger which pulled him into the auger trough. As a result of the injury, plaintiff's right arm was pulled off above the elbow and, although later reattached by surgeons, his arm remains basically useless at the present time.

Plaintiff relies upon two theories for recovery. First, plaintiff argues that he is entitled to recovery under the tort theory embodied in § 324A of the Restatement (Second) of Torts. Second, plaintiff contends he is entitled to recovery under a third-party beneficiary contract theory. Moreover, plaintiff stoutly maintains that on either theory he has raised issues of fact which mandate the denial of summary judgment to the defendant.

Before determining whether plaintiff is entitled to recovery under any theory, we must consider what state law applies to this action. Plaintiff argues that under the center of gravity rule, the contacts predominate in favor of application of Mississippi law. Defendant, however, argues that the law of Tennessee applies.

It is well settled that in federal diversity cases the choice of law is determined by conflict of law principles recognized by the forum state. *Johnson v. Knight,* 459 F.Supp. 962, 967 (N.D.Miss. 1978). Under the applicable Mississippi conflict of law principles, Tennessee law will apply to both a contract and tort theory of recovery. Under the tort theory, Tennessee law would apply since the alleged tortious acts and injury occurred in Memphis, Tennessee. *Browning v. Shackleford,* 196 So.2d 365 (Miss.1967). Under a contract theory, Tennessee law would also apply. Plaintiff was a resident of Tennessee at the time of his injury and the alleged contract was entered into and performed in Tennessee. The only relation this suit has to the State of Mississippi is that defendant is qualified and licensed to do business in the state and that plaintiff chose to file his lawsuit here. Therefore, the law of Tennessee will apply. *See Johnson v. Knight,* 459 F.Supp. 962, 967 (N.D.Miss.1978).

## I. *Recognition of § 324A in Tennessee*

Plaintiff's tort theory of recovery relies on § 324A of the Restatement (Second) of Torts, which states:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm; or

(b) he has undertaken to perform a duty owed by the other to the third person; or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

1. The court hereby withdraws its Memorandum Order of April 28, 1983, and substitutes this opinion in its place.

Restatement (Second) of Torts, § 324A. In *Mosley v. United States,* 456 F.Supp. 671 (E.D.Tenn.1978), a federal district court, applying Tennessee law, stated:

> It does not appear that Tennessee has ever applied this rule [324A], the plaintiff cited no authority reflecting the adoption by Tennessee of either of the foregoing versions of it, and this Court is aware of none. Where Tennessee law is applicable, as here, there can be no recovery under a legal theory which does not appear to exist in this state.

*Id.* at 675. Plaintiff relies, however, on *Neal v. Bergland,* 646 F.2d 1178 (6th Cir. 1981), for its proposition that § 324A would be applied by the Tennessee Supreme Court if it were presented with the issue.

The *Neal* litigation, originally filed in the Circuit Court of Roane County, Tennessee, was removed upon application of defendant Bergland, the then Secretary of Agriculture, to the United States District Court for the Eastern District of Tennessee. 646 F.2d at 1179. The suit was brought as a direct action against the Secretary of Agriculture asserting that Title V of the Housing Act of 1949, 42 U.S.C. § 1471 *et seq.,* and the regulations issued thereunder, 7 C.F.R. § 1802.-71 *et seq.,* create an obligation on the part of the Farmers Home Administration (FmHA) to supervise, inspect or warrant the construction of houses built with FmHA financing. *Id.* Holding that no such duty was created under the federal laws, the district court dismissed the federal defendants, and remanded the case to state court as to the nonfederal defendants. *Neal v. Bergland,* 489 F.Supp. 512, 516 (E.D.Tenn. 1980). On appeal, the Sixth Circuit reversed because of:

> the principle expressed in § 323 of the Restatement (Second) of Torts (1965) that one who undertakes to act, even though gratuitously, is required to act carefully and with the exercise of due care and will be liable for injuries proximately caused by failure to use such care.

*Neal v. Bergland,* 646 F.2d 1178, 1181–82 (6th Cir.1981). Although we might be inclined to agree with the conclusion reached in *Cross Brothers Meat Packers v. United States,* 533 F.Supp. 1319 (E.D.Pa.1982), that the Sixth Circuit in *Neal* was applying federal law rather than Tennessee state law, nevertheless the Supreme Court in *Block v. Neal,* —— U.S. ——, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983), appears to have indicated a contrary interpretation. The Court in *Neal* characterized the action as one falling under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), 2671–2680. *Id.* 103 S.Ct. at 1092, 75 L.Ed.2d at 73. Because of this characterization, the Supreme Court assumed the Sixth Circuit was applying Tennessee law when discussing the Good Samaritan rule embodied in § 323 of the Restatement,[2] stating in footnote three:

> The Court of Appeals found that respondent stated a claim against the United States under the common law Good Samaritan doctrine which is described in § 323 of the Restatement (Second) of Torts (1965). However, the court did not expressly find that Tennessee law recognizes this doctrine, see 28 U.S.C. § 1346(b), and would apply it to a private person responsible for similar negligence.

*Id.* at n. 3. In view of the Supreme Court's interpretation, we must assume the Sixth Circuit was attempting to make an educated *Erie* guess of Tennessee state law in *Neal.* This being the case, the conflicting holdings of the district court in *Mosley* and the Sixth Circuit in *Neal* must be resolved in favor of the appellate court opinion. Indeed, if we were writing on a clean slate, the progressive principles of § 324A would be favored by us. Therefore, we hold that if the Tennessee Supreme Court were presented with the question, it would apply the Good Samaritan rule embodied in § 323 and § 324A of the Restatement (Second) of Torts. Because we so hold, we must now determine whether plaintiff has presented

---

**2.** Although the Court made this assumption, its decision was actually decided on other grounds. The question presented to the court in *Neal* was whether the claim was exempted by § 2680(h) of the Federal Tort Claims Act. Therefore, the Court's decision was based on federal and not Tennessee law. *Id.* 103 S.Ct. at 1092, 75 L.Ed.2d at 73.

an issue of material fact under § 324A requiring resolution by a jury.

## II. *Any Factual Issue(s)?*

Section 324A of the Restatement (Second) of Torts states:

one who undertakes gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm; or

(b) he has undertaken to perform a duty owed by the other to the third person; or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Id.* In order to present a factual issue to defeat the motion for summary judgment, plaintiff must submit, by affidavit, deposition or other discovery material, some evidence that defendant's actions fall into category (a), (b), or (c) of § 324A. Viewing the evidence in the light most favorable to plaintiff, we are compelled to conclude no material factual question remains for the trier of fact.

### A. *The Obligation and Performance of NATLSCO*

On November 9, 1978, Kraft, Inc. of Glenview, Illinois (Kraft), entered into an "Agreement for Services" with National Loss Control Service Corporation (NATLSCO). The agreement provided that NATLSCO would "provide Loss Control services on a request basis as approved and initiated by Kraft's Director of Safety and Security or other authorized employee." Though specifying the rate of compensation for any services rendered, the agreement made no mention of what services would actually be performed. Pursuant to discussions between NATLSCO and Kraft personnel, a service directive was issued by R.D.

Mulder, NATLSCO's account coordinator, to the service representatives working on the Kraft account. The service directive also stated that auditing of programs, physical inspections, etc. would be performed for Kraft on a request basis.

According to the deposition of Allen Jamison, Kraft's manager of Administrative Service for Industrial Foods Division, NATLSCO was requested to make quarterly physical hazard surveys and loss experience analyses at the plant in question. These services consisted of two basic functions: (1) analysis of previous accidents at the plant in order to determine loss patterns for concentrated study and (2) walk-through inspections to determine physical hazards by observing the physical layout and condition of the plant.

As explained by Jamison, loss analysis is retrospective. After injuries occur, the consultant attempts to determine the cause and its likelihood of recurrence. The walk-through inspection is a proceeding of the inspectors through the general traffic patterns of the plant, observing any physical hazards that might be within a reasonable distance of the inspectors. These were the only types of services requested by Kraft for quarterly inspections. Kraft did not request NATLSCO to perform a job safety analysis of any employee position; neither did it request an inspection of the plant's operating practices or procedures. Jamison stated, in his deposition testimony, that only if an inspector fortuitously observed an unsafe practice or procedure would Kraft expect NATLSCO's inspector to investigate and bring the unsafe practice to the attention of Kraft's management in the form of a recommended change.

This understanding was held not only by Jamison, but by Jack Hansen, Kraft's corporate safety manager. These two Kraft representatives testified consistently that NATLSCO was never called upon to perform a survey or inspection of operating practices or procedures involving equipment at the plant.[3] Since there had never before

---

**3.** While we are cognizant of the admonition in    Rule 56 against granting summary judgment in

been an accident involving the flake roll machines, no loss experience analysis was performed as to them.

That NATLSCO was not requested to inspect Kraft's operating practices and procedures was confirmed by Russell Mulder, NATLSCO's account representative, John W. Burger and Martin B. Currie, both NATLSCO inspectors for the Kraft account. It was their uncontradicted testimony that NATLSCO inspectors did not, nor were they requested to, survey the plant safety practices and procedures. Again, it is undisputed that only if the inspector happened to observe an unsafe procedure would he be required to investigate and report the situation to Kraft.

In addition, the Loss Control Survey reports for December 12, 1978, April 4, 1979, and June 26, 1979, indicate that the actual performance of NATLSCO inspectors conformed to the common understanding of the purpose of the quarterly inspections. These reports state as each inspection's purpose the performance of a loss experience analysis and a physical hazard survey. The results of the physical hazard surveys reveal the inspectors were searching for unsafe *conditions* of the plant and equipment, rather than *procedures* used in operating the equipment. For example, the December 12, 1978, survey report listed poor housekeeping, cracked grinder guards, unsecured gas bottles, and one employee observed not wearing safety glasses. To the extent failure to wear safety glasses might be considered a practice or procedure, this notation indicates the scope of NATLSCO's duty. The "practice" of employees wearing safety glasses was not investigated on a plant-wide basis. Only where the unsafe practice of not wearing safety glasses was fortuitously observed by the NATLSCO inspector did he make such a notation and recommendation to Kraft. This is entirely consistent with the deposition testimony of

both NATLSCO employees and disinterested Kraft personnel.

Only one inspection differed at all from those described above. On July 10, 1979, Kraft's Jamison wrote a letter to NATLSCO's Mulder requesting a change in the quarterly inspection process. Due to perceived changes in the Occupation Safety and Health Administration's (OSHA) position on defining "serious violations," Jamison requested NATLSCO to perform a simulated OSHA inspection. This pre-OSHA inspection was to be performed on a one-time basis during the third quarter of 1979. The specific purpose of this inspection, according to Jamison, was to have someone come in and play "the devil's advocate" for what needed to be done to pass an OSHA inspection. In this instance, however, the inspection was limited to physical hazards and only if an unsafe procedure was observed did Kraft expect NATLSCO to comment on it.

The pre-OSHA inspection took five days and involved two NATLSCO inspectors—Burger and Currie. According to Jamison and Hansen, this inspection was limited to a search for physical conditions which would be considered serious violations of OSHA regulations. The deposition testimony of Currie and Burger substantiates this fact as does the September 1979 Loss Control survey report completed following the inspection. That report deals exclusively with physical conditions observed by Burger and Currie and considered in violation of OSHA regulations.

Because it is uncontradicted that the sole purpose of the September pre-OSHA inspection was to identify physical hazards that violated OSHA regulations, an overview of those regulations is helpful. Pursuant to Section 6(a) of the Williams-Steiger Occupational Safety and Health Act of 1970, 84 Stat. 1593, the Secretary of Labor

---

suits in which a witness' credibility or veracity is at stake, we do not believe this is such a case. The depositions of Jamison, Hansen, Burger, Mulder, and Currie were taken at plaintiff's request. Throughout each deposition, the testimony was consistent. Although plaintiff's counsel attempted to elicit contradictory responses within each deposition, as well as among the five, the depositions taken as a whole evidence no inconsistencies and do not raise an issue of credibility or veracity.

promulgated occupational safety and health regulations which, at the time relevant to this suit, were codified in 29 C.F.R. § 1910. Subpart O of § 1910, entitled "Machinery and Machine Guarding," deals exclusively with physical conditions of machinery, not practices or procedures related thereto. Although this subpart most directly relates to the accident in question, various other regulations within 29 C.F.R. § 1910 were utilized by NATLSCO to simulate the OSHA inspection. *See, e.g.,* 29 C.F.R. § 1910.23 (guarding floor and wall openings and holes); 29 C.F.R. § 1910.25 (portable wood ladders); 29 C.F.R. § 1910.27 (fixed ladders); 29 C.F.R. § 1910.37 (means of egress); 29 C.F.R. § 1910.309 (national electric code); 29 C.F.R. § 1910.134(d) (air quality); 29 C.F.R. § 1910.151(c) (eye washing facilities). Each of these regulations pertain, as do OSHA standards generally, to physical conditions, not operating procedures.

Because of this uncontradicted testimony, we conclude there is no question as to NATLSCO's obligation and performance as it relates to the case *sub judice.* NATLSCO was requested to and did perform loss experience analyses and physical hazard surveys during 1979. No requests were made for practice or procedure surveys.

### B. *Application of Uncontradicted Facts to § 324A*

■ Subparagraph (a) of § 324A, Restatement (Second) of Torts would subject NATLSCO to liability if its "failure to exercise reasonable care increases the risk of such harm." Although plaintiff nominally alleges NATLSCO's failure to identify a potential hazard in the procedure used to clean the flake roll machine increased the risk of harm to plaintiff, this court is unpersuaded. To avail himself to this provision of § 324A, plaintiff must show some affirmative action by defendant such as recommending the hazardous procedure. Plaintiff has not even attempted such a showing. Mere negligence in failing to discover a danger, even if proved, would not subject NATLSCO to liability under § 324A(a).

■ Under subparagraph (b), however, mere negligence can subject a defendant to liability. That section would make NATLSCO liable for plaintiff's injuries if it had "undertaken to perform a duty owed by the other to the third person," and was negligent in the performance of such duty. Plaintiff alleges NATLSCO undertook to perform Kraft's duty to provide a safe work environment and was negligent in such performance, yet we find this contention unavailing. Through the uncontradicted depositions of Kraft's Hansen and Jamison, as well as NATLSCO's Burger, Currie and Mulder, NATLSCO proved that Kraft, as the employer, did not relinquish, nor did NATLSCO assume, the responsibility to provide its employees, including plaintiff, with a safe work environment. NATLSCO's activities were limited to inspections of physical conditions, not operating procedures. We emphasize that plaintiff presented no affidavit or other evidentiary material to rebut this evidence. For this reason, it is clear NATLSCO did not undertake to assume or take over Kraft's duty. Indeed, under Tennessee law, Kraft's duty to provide to employees, including plaintiff, with safe working conditions was non-delegable. *Overstreet v. Norman,* 44 Tenn.App. 343, 314 S.W.2d 47 (Tenn.App.1957). At most, NATLSCO's inspections, made on Kraft's request, merely paralleled the ongoing independent safety inspections of Kraft. As Jamison stated in his deposition, Kraft used NATLSCO's recommendations as a doctor's second opinion, and this does not impose § 324A(b) liability. *See Hill v. James Walker Memorial Hospital,* 407 F.2d 1036, 1042 (4th Cir.1969) (actions paralleling those of obligor and not in substitution therefor, will not subject actor to § 324A liability); *Blessing v. United States,* 447 F.Supp. 1160, 1195 (E.D.Pa.1978) (same).

In this respect, the basic facts in the instant case are similar to those in *Stacy v. Aetna Casualty & Surety Co.,* 484 F.2d 289 (5th Cir.1973). There Aetna conducted periodic inspections of the employer's facility pursuant to Aetna's workmen's compensation insurance policy with Purnell, the em-

ployer. The court of appeals held that there was no evidence that the employer delegated to Aetna, either by contract or course of conduct, any part of its direct and primary duty to discover unsafe conditions, and therefore, the case should not have been presented to the jury. *Id.* at 294. As the court stated in *Stacy,* "[p]roof that the insurer assisted [the employer] in those particular areas of its operation where the company felt it needed outside advice and recommendations falls far short of system-wide assumption of [the employer's] duty to discover latent hazards." *Id.* Here, as in *Stacy,* the employer directed the outside consultant to inspect a certain part of its operation. In *Stacy* the employer did not request inspection of a particular area of the plant where an employee was subsequently injured. *Id.* at n. 5. In the case *sub judice,* Kraft did not request, nor did NATLSCO perform, an inspection or survey of practices or procedures anywhere in the plant. The legal result is the same: plaintiff failed to place in issue the question of the outside consultant's assumption of the employer's duty to discover latent hazards. Therefore, NATLSCO may not be held liable under subparagraph (b) of § 324A.

Similarly, the court finds plaintiff failed to place at issue either Kraft's or plaintiff's reliance on NATLSCO's undertaking. Subparagraph (c) to § 324A would subject NATLSCO to liability if "the harm is suffered because of reliance of the other or the third person upon the undertaking." As noted above, Kraft did not expect NATLSCO to perform inspections or surveys of its practices and procedures, and therefore, could not have relied on NATLSCO to do so. The undisputed proof shows that NATLSCO was instructed by Kraft to inspect only physical conditions. In addition, Jamison and Hansen testified that even NATLSCO's recommendations concerning physical conditions were advisory only, and there was no reliance by Kraft. There is no proof in this case of actual reliance on NATLSCO's inspections as required in *Stacy.* 484 F.2d at 295. Nor has plaintiff presented any evidence, by affidavit or otherwise, that he relied on NATLSCO's in-

spections in his performance of cleaning procedures. Therefore, no question of fact is presented under § 324A(c). *Id.*

In summary, plaintiff wholly failed to present evidence which would place NATLSCO's liability under § 324A of the Restatement (Second) of Torts at issue. There is *no* proof that NATLSCO contracted or undertook to conduct inspections of practices or procedures or that previous accidents on the flake machine would have called the cleaning procedures to its attention. Accordingly, NATLSCO cannot be held liable under § 324A. *Id.* at 675.

### III. *Third Party Beneficiary Theory*

■ In his memorandum briefs, plaintiff makes an oblique reference to reliance on a breach of contract theory for recovery. Although plaintiff makes no express mention of such a theory in his complaint, even under plaintiff's version of the facts, such a theory would be unavailing. Because plaintiff was not a party to the contract between Kraft and NATLSCO, the only conceivable theory upon which plaintiff could rely would be that of a third-party beneficiary to the contract. Tennessee has long recognized the doctrine that:

> The beneficiary, though not a party to the contract, may maintain an action directly in his own name against the promisor, for such promise between the promisor and the promisee is made upon sufficient consideration for the benefit of the third party.

*Eidson v. Hardware Mutual Casualty Company,* 191 Tenn. 430, 439, 234 S.W.2d 836, 840 (1950). However, Tennessee also recognizes the rule that "an incidental beneficiary acquires no rights against the promisor or the promisee by virtue of the contract." *Willard v. Claborn,* 220 Tenn. 501, 419 S.W.2d 168, 1970 (Tenn.1967). In determining what constitutes an incidental beneficiary, the Tennessee courts have held that the intent of the parties as expressed by the plain language of the contract controls. *See, e.g., Willard v. Claborn,* 220 Tenn. 501, 419 S.W.2d 168, 1970 (Tenn.1967) (terms of contract must indicate intent to benefit

third person); *Rutherford County v. City of Murfreesboro,* 202 Tenn. 455, 304 S.W.2d 635 (Tenn.1957) (third party beneficiary status determined by intent of parties as matter of construction of contract); *E.O. Bailey & Company v. Union Planters Title Guaranty Company,* 33 Tenn.App. 439, 232 S.W.2d 309 (Tenn.App.1949) (controlling intention is that expressed by language of contract). As stated by the Tennessee Supreme Court in *Willard,* "the terms of the contract itself or the circumstances surrounding its execution [must] clearly indicate the contract was intended to operate for the benefit of some third person." *Id.* 419 S.W.2d at 170. In the case *sub judice,* nothing appears in the contract between Kraft and NATLSCO or in the circumstances surrounding its execution to indicate that the contract was entered into to operate for the benefit of the plaintiff. Nor has the plaintiff presented us with evidence to the contrary. The contract was entered into for the benefit of Kraft which was to receive loss control services and help in passing a Tennessee OSHA inspection. The fact that Kraft's employees benefited from the safer work environment was merely incidental to the main purpose of the contract. Therefore, even if plaintiff had alleged a breach of contract by NATLSCO in his complaint, plaintiff was merely an incidental beneficiary of the contract and as such obtained no rights against NATLSCO.

Being convinced that no genuine issue of material fact has been presented by plaintiff and as a matter of law, the court sustains defendant's motion for summary judgment.

Let an order issue accordingly.