63 So.2d 594

## McCLINTON v. McCLINTON.

### I Div. 424.

Supreme Court of Alabama.

Nov. 20, 1952.

Rehearing Denied March 19, 1953.

Lyons, Thomas & Pipes, Mobile, and Adams & Gillmore, Grove Hill, for appellant.

Scott & Porter, Chatom, and Paul S. Jones, Grove Hill, for appellee.

LIVINGSTON, Chief Justice.

This is an appeal from a judgment for plaintiff below for the sum of $6,750.

The defendant below, appellant here, offered no evidence on the trial of the cause and the issues were presented to the jury on the plaintiff's evidence alone.

The appellant challenged the sufficiency of the various counts of the complaint; requested the general affirmative charge, and other charges, and excepted to certain portions of the court's oral charge.

We deem it unnecessary to pass upon all the assignment of errors, as we are

of the opinion that the court erred in submitting the case to the jury. That is, the defendant was due the general affirmative charge as to all counts of the complaint. The rule is, of course, that before giving the general charge for defendant, the court must view the evidence in its most favorable light towards plaintiff's cause of action. We, therefore, summarize the evidence pertinent to the question for decision.

The undisputed evidence discloses that appellant and appellee, mother and son respectively, occupied adjoining houses in Jackson, Alabama. Appellant purchased a secondhand Ford automobile sometime in February, 1948. On March 17, 1948, appellant requested another one of her sons, Benny Ray McClinton, to drive her and her husband to the moving picture theater. The son did so, using his mother's car, but kept the car for his own use during the time his parents were in the theater. He returned to pick them up and drive them home. Upon arriving at his mother's home, Benny Ray was given permission by his mother to use the car for a short while to carry a friend home, but was told by her to park the car in appellee's garage when he returned. Benny Ray did park the car in appellee's garage upon his return about 10:00 or 10:30 o'clock. Appellee's house was a two-story garage apartment, the bottom story of which was a garage and storeroom, with living quarters on the second floor. Approximately two hours after the car was left in the garage, fire was discovered in the car, which fire spread to the building, completely destroying it, together with all its furnishings. The electrical system in the automobile had given some trouble, but the car had been repaired about a week prior to the night it burned. There was no evidence of a defective condition in the car—electrical or otherwise—after the repairs were made and prior to Benny Ray's discovery when he carried his friend home on the night the car burned. Appellee denied granting his mother permission to use his garage, but testified that the car had been parked there on at least two occasions previously and he had not complained to his mother about it. The evidence is clear to the effect that the fire originated in the automobile, but the only proof relied upon by appellee to establish the original cause of the fire is the testimony of his brother, Benny Ray McClinton, and an electrician by the name of Jim Lawlis. Benny Ray testified, in substance, as follows:

"I am a brother of the plaintiff, Gaines McClinton. I was living with my mother on March 17, 1948; her home is right next to the garage apartment of Gaines, which burned. When I got there, the house was not on fire, but the automobile was burning and it was parked in the garage in the lower part of my brother's apartment, under his living quarters. The apartment caught fire from the automobile. I placed this car in the garage; it was my mother's car and I parked it in this garage between 10:00 and 10:30 o'clock on the night of the fire. My mother had told me to park the car in this garage. I had operated this car on previous occasions. The ignition system or the electrical wiring in the car had given trouble, and the lights had gone out on it several times. The dimmer switch would not work at times. You would go to dim the lights and the lights would go out on you and you could turn on the lights and they would go back on. The dash board lights would come on and go out. I don't know what caused that. As far as I know the wires on the dash board were properly connected. The dash board panel was loose. I think there was a space in there. It would rattle where the speedometer was. To get in this garage, I had to come from behind the house across what used to be a corn field; I drove across this corn field back there and it was rough for about 250 or 300 yards. We had never had any trouble with the horn on this car."

On cross-examination, this witness, Benny Ray McClinton, testified substantially as follows:

"I took Mother and Daddy to the show that night around 7:00 or 7:15 o'clock; while they were in the show I

went up to a party at the school house and stayed there until I figured the show was over and I went back to the show to take them home. That would have been about 9:15 that I went back to pick them up. Merrida Coxwell was with me when I went back to take Mother and Daddy home. I took them home immediately from the picture show; Mother asked what time I would be in and I told her in 30 minutes or an hour. She did not ask where I was going. After we left Mother and Father at home, Merrida Coxwell and I went either to Tiny Hoven's place or to the Night Spot on the highway to get a cup of coffee. After that I took Coxwell home and then I returned home in the car; I drove the car home and put it in the garage. My mother had told me to put the car in the garage on account of the bad weather. I smoke cigarettes and I had been smoking that night.

"Q. Did you by any chance leave a lighted cigarette on the seat of that car? A. Not to my knowledge.

"Of course, I would not do that intentionally. I had been smoking that night. Coxwell does not smoke regularly, but I do. I did not leave the lights on in the car. I first noticed these defects that I speak of about two weeks after we had the car; we had had the car about a month. It was a secondhand car which my mother purchased from Sporl-Pearce Motor Company. I did most of the driving. Gaines knew about these defects about which I have testified; various ones of the children, including Gaines, had talked about these defects and what was to be done about them. We took the car to Sporl-Pearce to have the defects corrected. That was about a week or two or three days before the fire. When we got the car back from Sporl-Pearce the defects appeared to have been corrected. The first time I noticed that the defects were not entirely corrected was on the night of the fire, and after I had put my mother and father out. When I came back in I put the car up and my mother and

father had already retired when I got into the house at that time. I did not wake them. My father and I were the first ones that got to the fire with Gaines. The blaze at that time was inside the car itself as well as under the hood of the car. It was too hot to get in there to it."

Lawlis testified, in substance, as follows:

"I am in the electric business and am familiar with all types of electricity and electrical wiring. It is possible for a fire to originate from a short circuit in the light wires of an automobile. It would be possible for a fire to start from a short circuit in the dimmer switch of an automobile; also from the wiring of the automobile horn; or from anywhere there is electricity if a wire shorts out, it is possible for a fire to originate. No electric current runs through the dimmer switch except when the headlights are on. There are a number of places under the dash board where wires are close together where they can rub together and cause a short circuit; when they get hot and get where there is gas and oil, then they ignite. Assuming an automobile is in perfect condition and it catches fire from some cause and burns up, it can short out the horn and cause it to blow, even though the horn may have been in perfect condition prior to the fire."

The following is quoted from the case of Southern Ry. Co. v. Dickson, 211 Ala. 481, 100 So. 665, 669:

"As this court has often declared, findings of fact based on conjecture merely cannot be upheld. Southworth, Adm'x v. Shea, 131 Ala. 419, 30 So. 774; Miller-Brent Lumber Co. v. Douglas, 167 Ala. 286, 52 So. 414; John v. Birmingham Realty Co., 172 Ala. 603, 55 So. 801; Carlisle v. Central of Georgia Ry. Co., 183 Ala. 195, 62 So. 759; Dorman's Case [St. Louis & S. F. R. Co. v. Dorman, 205 Ala. 609, 89 So. 70], supra. As said in Southworth, Adm'x v. Shea:

" 'Proof which goes no further than to show an injury could have occurred in an alleged way, does not warrant

the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause.'

"But a nice discrimination must be exercised in the application of this principle. As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only. On the other hand, if there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence."

See also Mobile Light and Railroad Company v. Roberts, 192 Ala. 486, 68 So. 815; Central Bank & Trust Co., v. Alabama Broom & Mattress Co., 204 Ala. 410, 85 So. 738.

 We assume for argument that Benny Ray was his mother's agent when he "parked" the car in his brother's garage, nevertheless, the evidence is without "selective application" as to a plausible explanation as to the origin of the fire. See Georgia Power Company v. Edmunds, 233 Ala. 273, 171 So. 256. The most that can be said of the testimony of the electrical expert, Lawlis, is that it was *possible* for a defective dimmer switch to start a fire. As we view the record, all other defects in the lighting system had been corrected a few days before the fire. Lawlis also testified that no electric current passes through the dimmer switch when the lights were turned off, and Benny Ray testified that he cut off the lights when he parked the car in the garage. We are not unmindful of the testimony of Lawlis to the effect the electric wires may become crossed and cause a short circuit and thereby start a fire. We cannot bring ourselves to the conclusion that the proof points to appel-

lee's theory of causation, indicating a logical sequence of cause and effect. The proof here rests in speculation only. Authorities, supra.

The foregoing conclusion renders inapplicable the doctrine of res ipsa loquitur, for the reason that "while the doctrine permits an inference that the known act which produced the injury was a negligent act, it does not permit an inference as to what act did produce the injury, and there can be no foundation for the application of the doctrine where the physical act or thing which caused the injury is unknown or not disclosed." 45 C.J. 1212; See, also, 65 C.J.S., Negligence, § 220; Georgia Power Co. v. Edmunds, supra; Alabama Power Co. v. Bryant, 226 Ala. 251, 146 So. 602.

Reversed and remanded.

FOSTER, LAWSON and GOODWYN, JJ., concur.