Dr. Kenneth M. Hannon, one of the defendants, appeals from a judgment entered on a jury verdict in a medical malpractice suit.
L.E. Duncan sued Mobile Infirmary, Inc., Kenneth M. Hannon, M.D., and Alfred F. Callahan, M.D., claiming damages based on an alleged wrongful death, damages based on an alleged loss of services, and damages based on alleged nursing services Duncan provided.
The jury returned a verdict against Mobile Infirmary, Inc., and Dr. Hannon on both the wrongful death claim and the claims seeking damages based on loss of services and on nursing services provided; and it returned a verdict in favor of Dr. Callahan on all claims.
Mobile Infirmary entered into a pro tanto settlement, settling its liability for $95,000 — $75,000 was applied in partial satisfaction of the $100,000 the jury assessed for Duncan's loss of services and for the nursing services he provided; $20,000 was applied in partial satisfaction of the $500,000 the jury assessed on Duncan's claim of wrongful death. Therefore, Dr. Hannon is the only defendant appealing.
Duncan's 11-year-old daughter, Sonya, suffered from a genetic abnormality known as Prader-Willi syndrome[1] and from scoliosis *Page 87 
(or curvature of the spine). In 1981, in order to straighten the spine, she underwent complicated surgery known as the Harrington rod procedure,[2] which carries with it a possibility of paralysis, because the spine and spinal cord are being moved as part of the procedure. In order to prevent paralysis, following the insertion of the Harrington rods, a procedure known as the "wake-up" test is conducted in which the patient is awakened to determine whether she can move her lower extremities. If the patient is unable to move her lower extremities during the "wake-up" test, the tension on the rods must be reduced immediately or the rods taken out completely. Prior to the surgery, because of the complexity of the surgery and because of the possibility of paralysis, Dr. Hannon gave Duncan and his wife a five-page consent form, which explained the procedure in detail, including the "wake-up" test; and Dr. Hannon also met with Duncan and his wife personally to discuss the procedure and to answer any questions they had after thoroughly reviewing the consent form. Thereafter, Duncan and his wife signed the consent form. On January 20, 1981, Sonya was admitted to Mobile Infirmary, and on that date Dr. Hannon again met with Duncan and his wife concerning the surgery, which had been scheduled for January 23.
By 12:35 p.m. on January 23, 1981, Dr. Hannon had made the incision and had placed the rods. With the incision still open, he began the "wake-up" test. At this time, the anesthesiologist terminated infusion of the anesthetizing agent and began to give Sonya oxygen. After 15-30 minutes, Sonya opened her eyes and began to move around. Intermittently, she would move her upper extremities on request, but at other times she would not. There was no voluntary movement from her lower extremity, and this fact evidenced some cortical damage.
Between 1:30 and 2:00 p.m., when Sonya still had not moved her lower extremities, Dr. Hannon decided to, and did, remove the rods; and he closed the incision. However, removal of the rods did not restore movement to Sonya's lower extremities, and Sonya was paralyzed from the chest down for the next six years, until her death. During that time, she developed decubitus ulcers[3] (which led to osteomyelitis[4]) and suffered from kidney infections (which caused septicemia[5] and pneumonia).
Sonya died on January 6, 1987. According to the death certificate, Sonya died of respiratory arrest due to severe chronic obstructive lung disease and scoliosis. Duncan, however, contends that Sonya's death was the direct result of her paralysis, because of which, he claimed, she had developed decubitus ulcers and kidney infections, complications that, according to Duncan, are common among paraplegics and often lead to premature death. Consequently, Duncan, as Sonya's father, sued Dr. Hannon for damages based on an alleged wrongful death; and he also, individually, *Page 88 
sued Dr. Hannon for damages to compensate for his loss of Sonya's services and for the nursing services he provided Sonya. Dr. Hannon moved for a directed verdict at the close of Duncan's case and again at the close of all the evidence, contending that Duncan had failed to present evidence sufficient to raise a jury question on the issues of medical negligence and proximate cause. The trial court denied the motions. Thereafter, the jury awarded Duncan $500,000 against Dr. Hannon on Duncan's wrongful death claim and $100,000 against Dr. Hannon on Duncan's claims alleging loss of services and alleging nursing services. The trial court entered a judgment on the verdict and denied Dr. Hannon's motion for a new trial, or, in the alternative, for a judgment notwithstanding the verdict, or for a remittitur. Dr. Hannon appeals. For the reasons discussed below, we affirm in part and reverse in part and remand.
This cause of action accrued before June 11, 1987, and the action was pending in the courts of this state prior to that date; therefore the applicable standard of review is the "scintilla" rule. Ala. Code 1975, § 6-5-552, § 6-5-549, and §12-21-12. In Bradford v. McGee, 534 So.2d 1076, 1079 (Ala. 1988), this Court set out the standard of review and the law governing actions brought under the Medical Liability Act:
 " ' "A motion for directed verdict or J.N.O.V. is tested against the scintilla rule, which requires that a question go to the jury 'if the evidence or any reasonable inference arising therefrom, furnishes [so much as] a mere gleam, glimmer, spark, the least particle, the smallest trace, or a scintilla in support of the theory of the complaint.' Alabama Power Co. v. Taylor, 293 Ala. 484, 306 So.2d 236 (1975). In reviewing a trial court's ruling on these motions, the appellate court, guided by the standard of the scintilla rule, determines whether there was sufficient evidence below to produce a conflict warranting jury consideration. Baker v. Chastain, 389 So.2d 932 (Ala. 1980). Like the trial court, the appellate court must view all the evidence in a light most favorable to the non-moving party. Ritch v. Waldrop, 428 So.2d 1 (Ala. 1982)." '
 "Peete v. Blackwell, 504 So.2d 222, 224 (Ala. 1986) (quoting Hammond v. City of Gadsden, 493 So.2d 1374, 1376 (Ala. 1986))."
See, also, Warren v. Ousley, 440 So.2d 1034 (Ala. 1983); Hansonv. Couch, 360 So.2d 942 (Ala. 1978).
Duncan does not claim that the Harrington rod procedure should not have been performed on Sonya. Rather, Duncan claims that the applicable standard of care would have required Dr. Hannon to remove the rods earlier during the course of the procedure, and that if he had done so, he would have discovered the paralysis earlier and Sonya probably would not have suffered permanent paralysis, which, Duncan says, ultimately led to Sonya's premature death.
Dr. Hannon contends that the evidence failed to establish that he deviated from the applicable standard of care; failed to establish that earlier release of the surgically placed rods probably would have prevented Sonya's paraplegia; failed to establish that Sonya's paraplegia caused her death six years later; and failed to establish the value of Sonya's services to Duncan. That is, Dr. Hannon contends that Duncan failed to prove that in 1981, when the surgery was performed, Dr. Hannon's actions were a deviation from acceptable medical practice; he contends that in fact it was not a deviation not to perform an interoperative test of motor function at all (such as the "wake-up" test), but, instead, that it was acceptable to await monitoring in the recovery room to determine whether the patient was paralyzed; that the testimony of Duncan's expert witness, when considered as a whole, did not establish a causal connection between the paralysis that occurred in 1981 and Sonya's death in 1987; that none of the facts upon which Duncan's expert witness testified were found in the records of Sonya's terminal illness; and that Duncan failed to produce evidence of the value of Sonya's services or *Page 89 
the value of the nursing services Duncan had provided Sonya.
 "Section 6-5-484, Code of Alabama (1975) [a part of the Alabama Medical Liability Act], as we have construed it, imposes a legal duty upon doctors to exercise the degree of reasonable care, diligence, and skill that reasonably competent physicians in the national medical community would ordinarily exercise when acting in the same or similar circumstances. To recover damages for an alleged breach of this duty, a plaintiff must produce evidence that establishes 1) the appropriate standard of care; 2) the doctor's deviation from that standard; and 3) a proximate causal connection between the doctor's act or omission constituting the breach and the injury sustained by the plaintiff. To present a jury question, the plaintiff must adduce some evidence indicating that the alleged negligence (the breach of the appropriate standard of care) probably caused the injury. A mere possibility is insufficient. The evidence produced by the plaintiff must have 'selective application' to one theory of causation.. . .
 " 'What was said in McClinton v. McClinton, 258 Ala. 542, 544-45, 63 So.2d 594, 597 (1952), is appropriate in this case:
 " ' "Proof, which goes no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause." '
 " 'But a nice discrimination must be exercised in the application of this principle. As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deductible from them as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only.'
". . . .
 "Generally, a plaintiff must establish these prima facie elements by introducing expert testimony. . . . [M]edical intricacies . . . require the use of expert testimony. In determining whether . . . medical experts provided the necessary scintilla of evidence to present a jury question as to whether [a physician] departed from the applicable standard of care, and whether such a departure proximately caused [the injury complained of], we must review the testimony as a whole and not abstractly. . . .
 " '[A] witness's isolated answer to a particular question, removed from the totality of that witness's testimony that explains or qualifies that answer, does not satisfy our scintilla-of-evidence sufficiency standard.' "
Bradford v. McGee, 534 So.2d 1076, 1079-80 (Ala 1988). (Some emphasis original in Bradford and some emphasis added inBradford.) (Citations omitted.) See, also, Brillant v. Royal,582 So.2d 512 (Ala. 1991) (a case in which the Court held that the plaintiff presented sufficient evidence to create a jury question as to whether the doctor's alleged negligence "probably caused" plaintiff's injury).
Therefore, whether the trial court properly denied Dr. Hannon's motion for judgment notwithstanding the verdict turns on whether, viewing the evidence in the light most favorable to Duncan, one must conclude that Duncan satisfied the burden of producing sufficient evidence of the appropriate standard of care; of Dr. Hannon's deviation from that standard of care; and of a proximate causal connection between Dr. Hannon's breach and Sonya's death (resulting from a "selective application" of the evidence to a theory of causation). If Duncan met that burden, then the case was properly submitted to the jury. SeeBradford v. McGee.
Although the record reveals that in 1981 Dr. Hannon was not required under the appropriate standard of care to conduct the "wake-up" test, he nonetheless undertook to perform that test and therefore *Page 90 
was under a duty not to deviate from the appropriate standard of care applicable to "wake-up" tests. See Fireman's FundAmerican Ins. Co. v. Coleman, 394 So.2d 334 (Ala. 1980).
Dr. Hannon contends that Duncan failed to establish that Dr. Hannon breached the duty of care in failing to remove the rods immediately upon learning that Sonya could not move her lower extremities. He contends (re-emphasizing that the "wake-up" test was not required and was not used by all surgeons in 1981) that the point at which a surgeon determines whether he should remove the rods is purely a matter of the surgeon's judgment; and that, in his judgment, as the surgeon in Sonya's case, he did not think that he should have removed the rods until 1 hour and 25 minutes after beginning the "wake-up" test.
Duncan contends that Dr. Hannon should have removed the rods immediately upon learning of Sonya's inability to move her lower extremities, which was, according to Duncan, within 25 minutes of beginning the test.
According to the testimony and the operative notes, the "wake-up" test was begun at 12:35 p.m. and, according to the nurse anesthetist in Sonya's case, within 15 minutes of the beginning of the test Sonya was moving her head and arms. Within 25 minutes, according to the nurse anesthetist, Sonya was awake enough that she was "moving and squeezing but she could not move her feet." At this point, the nurse anesthetist was constantly asking Sonya, whose eyes were open and who was conscious, to move her feet. The responses from Sonya were communicated to Dr. Hannon.
According to Dr. Elbert Schmitt, Jr., one of Dr. Hannon's expert witnesses, as soon as it was determined that a patient was consistently moving the upper part of her body and her hands but could not move the lower part of her body, the applicable standard of care required the physician to immediately reduce the pressure exerted by the Harrington rods or to remove the rods. Dr. Schmitt further testified that although the determination to reduce the pressure or to remove the rods is within the surgeon's judgment, there are guidelines to follow and that it is possible for a surgeon to act below the standard of care in exercising that judgment.
Based on a hypothetical question posed to Dr. Schmitt — a patient within 20 or 25 minutes of the beginning of the test is essentially conscious; her eyes are open; she is moving her head, reacting in such a manner that the anesthetist is worried that the tube is going to come out; she is fighting against the arm straps; she has moved her hand on command, but has not moved the lower part of her body; and the surgeon is told by the anesthetist that the patient is doing that consistently — he testified that, in his opinion, that set of circumstances would indicate that the Harrington rods should be removed or adjusted.
Dr. Allen Edmondson, another of Dr. Hannon's expert witnesses, who also testified as to the standard of care, stated that once a determination is made that a patient will not move her legs, but will move her arms and is conscious; once the doctor has enough information to know that she moves her hand on command, but that she does not move her feet on command, and the doctor is aware that she cannot move her legs, or it is not clear that she can, then the earlier the Harrington rods are taken out or adjusted, the better.
Furthermore, Dr. William G. Winter, one of Duncan's expert witnesses, expressed his opinion that Dr. Hannon should have removed the rods well before the hour was up and that Dr. Hannon's failure to do so fell below the standard of care applicable to the performance of the "wake-up" test.
Based on the foregoing, we hold that on the question whether Dr. Hannon's actions deviated from the appropriate standard of care for performing "wake-up" tests, Duncan presented sufficient evidence to submit the question to the jury.
Dr. Hannon also contends that Duncan failed to prove that Sonya would not have been permanently paralyzed had Dr. Hannon removed the rods when it first *Page 91 
became apparent that Sonya could not move her lower extremities.
 " 'The rule of our cases in malpractice suits is that there must be something more than a mere possibility — something more than one possibility among others — that the negligence complained of was the cause of the injury. There must be some evidence to the effect that such negligence probably caused the injury. . . . But this does not eliminate the scintilla evidence rule. If there is a scintilla of evidence that the negligence complained of probably caused the injury, a jury question is presented.' "
Ensor v. Wilson, 519 So.2d 1244, 1251 (Ala. 1988) (quotingMarshall County v. Uptain, 409 So.2d 423, 426 (Ala. 1981), andOrange v. Shannon, 284 Ala. 202, 209, 224 So.2d 236, 239
(1969), and quoted as authority in Bradford v. McGee, supra).
In this case, Duncan presented Dr. Leston B. Nay, a neurologist, who testified that Dr. Hannon's failure to remove the Harrington rods earlier probably caused Sonya's permanent paralysis. In his opinion, Dr. Nay testified, if the "wake-up" test had started at 12:35 p.m. and approximately 25 minutes later the rods had been removed, "in terms of reasonable medical probability . . . the permanent paralysis would not have occurred."
Further testimony as to the proximate cause of Sonya's paralysis was elicited from Dr. William G. Winter, one of Duncan's experts, who stated that, in his opinion, if the tension of the rods had been markedly changed during the 10 to 15 minutes after the "wake-up" test was first observed to indicate a dangerous condition, then "more likely than not [Sonya] would have recovered function."
Based on the foregoing, we hold that Duncan presented sufficient evidence to create a jury question as to whether Dr. Hannon's alleged failure to timely remove the Harrington rods was the proximate cause of Sonya's paralysis (i.e., whether it "probably caused" Sonya's paralysis).
Dr. Hannon also contends that Duncan failed to prove that the paraplegia suffered in 1981 probably caused Sonya's death.
The death certificate stated that Sonya died of "(a) respiratory arrest due to (b) severe chronic obstructive lung disease and (c) scoliosis." However, we note the testimony of Duncan's expert witness, Dr. Joseph Sapala, an anatomical and forensic pathologist, whose qualifications are not in issue, that he completely disagreed with the death certificate, even though he had never treated Sonya and even though the physician who filled out the death certificate had been Sonya's treating physician for years:
 "Quite frequently, death certificates are filled out in error and the medical examiner, the forensic pathologist has to re-do death certificates by doctors because in general doctors are not taught how to fill out death certificates properly.
 ". . . [A]ll I see [in this case] is an improperly filled out death certificate . . . because it does not list the basic disease that the child had . . . the Prader-Willi [syndrome]; . . . the spinal cord problem; . . . the urinary tract infection; and it uses very general vague terms. Everybody who dies stops breathing. That's respiratory arrest. That's not very scientific."
Even Dr. John McAtee, one of Dr. Hannon's expert witnesses, testified that he did not agree with the causes of death listed on the death certificate — he said that the death certificate incorrectly listed chronic obstructive lung disease as one of the causes of Sonya's death.
Furthermore, according to Dr. Sapala's testimony, Sonya's death was proximately related to the paraplegia caused during the Harrington rod procedure. He stated that the "[p]araplegia initiated all of the conditions which caused the infection which caused [Sonya's] death"; that a patient without Prader-Willi syndrome who suffers trauma to her spine resulting in the type of paraplegia that Sonya had "will die generally within [10] years from complications of urinary tract infection"; that the paraplegia was a significant factor in Sonya's *Page 92 
case, because she was a child who had "Prader-Willi syndrome, a genetic abnormality, who was born with this condition of being short and being heavy and [she] is then going to live but not live a normal life and then along comes the operation and the child goes downhill much more rapidly [and] succumbs much faster because of the complications of the operation and also [because of] the Prader-Willi syndrome."
Dr. Hannon contends that Dr. Sapala had no factual foundation in the medical records or in the death certificate on which to base his opinion.
Duncan, however, contends that every factual premise for Dr. Sapala's testimony came directly from the medical records generated between Sonya's paralysis in 1981 and her death in 1987, not just from the hospital records from her last hospitalization. A review of the record establishes that in forming an opinion as to the proximate cause of Sonya's death Dr. Sapala considered the following hospital records, which were admitted into evidence: an October 1984 record, which revealed that Sonya was admitted to the hospital for treatment of a "sacra decubitus" ulcer with bone involvement secondary to paraplegia, resulting in osteomyelitis or infection of the bone; a November 1983 record indicating that Sonya had been admitted to the hospital, chiefly complaining of "fever and chills almost certainly pyelonephritis" (a kidney infection that usually comes from a bladder infection), which, according to Dr. Sapala, is associated with paraplegia, but not with scoliosis and Prader-Willi syndrome; an X-ray of Sonya's chest taken on January 30, 1981 (the date of the hospital admission during which Sonya was paralyzed), which revealed that Sonya had a normal heart and a normal lung field (this fact, according to Dr. Sapala, meant that Sonya's scoliosis was not restricting her ability to breathe); and an X-ray taken on January 5, 1987 (the day before Sonya died), which indicated that Sonya was not suffering from chronic obstructive lung disease at the time of her death (one of the causes of death listed on the death certificate), but that her suffering was "compatible with pneumonia" (which in turn was related to the pyelonephritis and the osteomyelitis, which in turn were related to the paraplegia).
This explanation is more than a mere conjecture. The evidence, which was established through the testimony of Dr. Sapala, has selective application to the theory that Sonya's paraplegia was the proximate cause of Sonya's death. See,Bradford v. McGee, supra.
Based on the foregoing, we affirm the $500,000 portion of the judgment on Duncan's claim of wrongful death.
Last, Dr. Hannon contends that Duncan failed, as a matter of law, to prove his claims relating to the loss of services and to the nursing services he provided, because, Dr. Hannon argues, Duncan failed to prove their value.[6] Although conceding that the record is devoid of any testimony, expert or otherwise, concerning the value of Sonya's services or the value of the nursing services Duncan provided Sonya, Duncan contends that "Alabama law does not require a parent claiming loss of services to prove the actual monetary value of a child's lost services or of a parent's nursing services." Rather, Duncan contends that the jury could determine the loss "from the fact of relationship, family circumstances and living conditions, the value of the child's future services, the child's age [and] physical and mental development, as well as the jurors' own observations and experience." See C. Gamble,Alabama Law of Damages, § 20-4 (2d ed. 1988).
In Smith v. Richardson, 277 Ala. 389, 393-94, 171 So.2d 96,100 (1965), the Court, holding that a jury award of $5165 to the parent of an injured child was speculative to the extent that it exceeded actual medical expenses in the amount of $1,009.50, which was properly shown, since there was a complete lack of any proof of the value of the child's services and of nursing services rendered by the parent or parents, reversed *Page 93 
the judgment and remanded the case, stating as follows:
 "The burden is upon one claiming damages to establish the existence of, and the amount of damages by competent evidence. . . .
". . . .
 "A father may recover as damages resulting from the negligent bodily injury of his minor child, medical expenses in treating such injuries, and compensation for loss of services. . . . If the child receives permanent injuries the recoverable damages are such as will compensate the parent for the loss of the child's services up to the time of his majority. . . .
 ". . . ['Services' in the case of a child] means the labor and assistance of a child rendered for the [parent], and [implies] a loss measured by pecuniary standards of value. The loss of the society of a child as distinguished from the loss of [the child's] services, cannot form the element of recoverable damages.
 "When a parent loses time from his work or duties in caring for an injured child, the measure of damages recoverable for the parent is the value of the services in nursing and caring for the child."
(Emphasis added.) See Johnson v. Harrison, 404 So.2d 337 (Ala. 1981) (a case in which the Court held that evidence of damages cannot be speculative).
In this case, Duncan's only witness testified only as to what Sonya's services were (i.e., helping to clean the house and mowing the lawn) and as to the nursing care Sonya was provided after she became a paraplegic. No one testified as to the value of these services. In order for Duncan to recover for the loss of Sonya's services and for the nursing services he provided Sonya, he had to prove not only that a loss occurred but also the reasonable value of those losses "measured by pecuniary standards." Smith v. Richardson. This he failed to do. As inSmith v. Richardson, in this case there was a complete lack of proof as to the value of Sonya's services or the value of the nursing services rendered by Duncan. Because Duncan failed to establish the value of the services, we hold that the jury's award was speculative, and, to the extent that the judgment awards a recovery based on that verdict, the judgment is due to be reversed.
We note, however, that even though a person technically is entitled to nominal damages when there has been proof of a breach of duty, because of the pro tanto settlement entered into between Mobile Infirmary, Inc., and Duncan (in which $75,000 of the total settlement amount was paid in partial satisfaction for the $100,000 judgment entered on Duncan's claims for the loss of Sonya's services and the nursing services he provided), the nominal damages award has more than been satisfied.
We, therefore, reverse the judgment insofar as it related to the loss of services and to the nursing services provided, and we remand the cause for the entry of a judgment consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and MADDOX, SHORES and KENNEDY, JJ., concur.
[1] Prader-Willi syndrome: "a congenital syndrome of unknown etiology characterized by short stature, mental retardation, polyphagia [excessive eating] with marked obesity, and sexual infantilism; initially severe muscular hypotonia [a diminution or loss of muscular tonicity, in consequence of which the muscles may be stretched beyond their normal limits] and poor responsiveness to external stimuli decrease with age."Stedman's Medical Dictionary, 1535 (25th ed. 1990).
[2] The Harrington rod procedure is a time-consuming, tedious, complicated surgery. According to the brief of Dr. Hannon (pp. vi-vii, citing Dr. Hannon's testimony found at pp. 1018-26 of the record), with the patient lying flat on her stomach on the operating table, the surgeon makes an incision down the back along the tail of the spine. The surgeon then strips and scrapes all the muscles away from the spine with a special instrument and chisels holes in the spinal column into which hooks with wire are placed. Thereafter, the surgeon prepares the spine to accept the metal rods alongside the spine. The spine is then pulled into place along the rods with ratchets and other devices. While this procedure is taking place, the spine has to be manipulated into place. The incision is then closed.
[3] A "decubitus ulcer" is defined as "[a] chronic ulcer that appears in pressure areas in debilitated patients confined to bed or otherwise immobilized, due to a circulatory defect in the area under pressure. Also called bedsore." Stedman's Medical Dictionary, 1661 (25th ed. 1990).
[4] "Osteomyelitis" is defined as "inflammation of the bone marrow and the adjacent bone." Stedman's Medical Dictionary, 1109 (25th ed. 1990).
[5] "Septicemia" is defined as "a systemic disease caused by the spread of microorganisms and their toxins via the circulating blood." Stedman's Medical Dictionary, 1405 (25th ed. 1990).
[6] Because Dr. Hannon, on appeal, does not challenge the amount of the jury's verdict on the ground of excessiveness, that issue is not before us.