[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 276 
The defendant Dr. William C. Williston appeals from a judgment entered on a jury verdict in a medical malpractice suit.
In January 1986, the minor plaintiff, Amanda Lynn Ard, entered South Baldwin Hospital to undergo a routine appendectomy. During the surgery, Amanda suffered irreversible brain damage, leaving her cortically blind and permanently unable to walk, talk, or care for herself. Subsequently, Amanda, by and through her mother and next friend, Annette Ard; and her mother, individually; sued Dr. Williston, alleging medical malpractice.[1] The jury returned a $4,500,000 verdict for Amanda and a $1,000,000 verdict for the mother. Dr. Williston moved for a judgment notwithstanding the verdict, or, in the alternative, to alter or amend the judgment, or, in the alternative, for a new trial or a remittitur. The trial court denied Dr. Williston's post-judgment motion. Dr. Williston appeals. We affirm the $4,500,000 judgment for Amanda; and we affirm the judgment for the mother conditioned upon her accepting a remittitur of $590,133.22, within 30 days of the date of this opinion (November 20, 1992), which will result in a judgment for the mother of $409,866.78.
 ISSUE I
Dr. Williston contends that the trial court erred in denying a new trial because, he says, certain jurors, including the foreperson of the jury, failed to respond correctly to questions asked of them on voir dire.
In Union Mortgage Co. v. Barlow, 595 So.2d 1335 (Ala. 1992),cert. denied, ___ U.S. ___, 113 S.Ct. 301, 121 L.Ed.2d 224
(1992), recognizing that parties in litigation are entitled to true and honest answers from prospective jurors so that they can *Page 277 
exercise their right to strike a juror, this Court set forth the standard of review applicable to this issue:
 "The proper inquiry on a motion for a new trial based on improper or nonexistent responses to voir dire questions is whether the response, or the lack of response, resulted in probable prejudice to the movant. Not every failure of a prospective juror to respond correctly to a voir dire question will entitle the losing party to a new trial.
 "The determination of whether the complaining party was prejudiced by a juror's failure to answer voir dire questions is a matter within the discretion of the trial court and will not be reversed unless the court has abused its discretion. Some of the factors that this Court has approved for using to determine whether there was probable prejudice include: 'temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about.' Freeman [v. Hall, 286 Ala. 161, 167, 238 So.2d 330, 336 (Ala. 1970)]."
595 So.2d at 1342-43 (citations omitted). See, Land Associates, Inc. v. Simmons, 562 So.2d 140 (Ala. 1989), cert.denied, ___ U.S. ___, 111 S.Ct. 1305, 113 L.Ed.2d 240 (1991);Ensor v. Wilson, 519 So.2d 1244 (Ala. 1987); Alabama Gas Corp.v. American Furniture Galleries, Inc., 439 So.2d 33 (Ala. 1983).
In this case, the plaintiffs' counsel asked the prospective jurors the following question during voir dire:
 "Have any of you or members of your family ever been a defendant in a lawsuit for damages? . . . Where somebody, in other words, sued you or made a claim against you or members of your family?"
Following the trial, an investigation revealed that three of the jurors (including the foreperson) or members of their families had been involved in events that required an affirmative response, but none of them responded accordingly. One of the jurors failed to disclose that her husband had been a defendant in a lawsuit over "$713 due on account"; another failed to disclose that a member of her family had been a defendant in a suit over a failure to pay a promissory note; and the foreperson failed to disclose that she had been a defendant in two suits filed in small claims court and that her father had been a defendant in seven collection matters (six resolved either through consent judgments or by simply being marked "satisfied" following payment and the seventh being an action based on a "Bill for Sale for Division" filed in May 1989 and disposed of in August 1990).
Applying our standard of review on the issue of jurors' improper responses, we cannot hold that the trial court abused its discretion in finding that there had been no prejudice to Dr. Williston. From the evidence, the trial court could have found inadvertence on the part of the jurors or a misunderstanding of the question as it related to them. SeeEnsor v. Wilson, supra. In fact, in its order denying Dr. Williston's post-trial motions, the trial court construed the phrase "a lawsuit for damages" to summarily exclude collection cases from consideration and found that Dr. Williston "suffered no injury or prejudice when several potential jurors failed to disclose that they or members of their family had been defendants in debt collection cases."
Under the circumstances, we find no error in the trial court's ruling.
 ISSUE II
Dr. Williston next contends that he was entitled to a new trial because of what he says was the prejudicial effect of the testimony of Sandy McGill, the administrator of South Baldwin Hospital; he says that that testimony injected insurance coverage into the case.
McGill was called during the plaintiffs' case-in-chief to testify with respect to Dr. Williston's relationship with South Baldwin Hospital. After a lengthy examination by the plaintiffs' counsel, who had called McGill as an adverse witness, counsel for South Baldwin Hospital questioned McGill concerning how a physician obtained staff *Page 278 
privileges with the hospital. In response to one of these questions, McGill made a general reference to insurance, stating that one of the requirements for a physician to practice at the hospital was that he had to present evidence that "he is covered with insurance." No one objected at that point in the examination. Only after further examination of the witness did Dr. Williston object, at which time the plaintiffs requested that the trial court instruct the jury to "ignore whatever they heard about insurance," rather than grant a mistrial. The trial court offered to give a curative instruction to eradicate the prejudicial effect of the evidence, if any, see Lloyd Noland Foundation, Inc. v. Harris,295 Ala. 63, 322 So.2d 709 (1975), but Dr. Williston rejected that offer because, he said, a curative instruction might "magnify or emphasize" the point. In his new trial motion Dr. Williston argued that the injection of insurance into the trial ineradicably prejudiced the jurors' minds.
The determining factor in those cases in which a witness gives an unresponsive answer mentioning "insurance" is whether the remark concerning insurance was prejudicial; i.e., in this case we must consider whether Dr. Williston was prejudiced to such an extent that any improper influence of the subject of insurance could not be eradicated from the jurors' minds. SeeThompson-Weinman Co. v. Robinson, 386 So.2d 409 (Ala. 1980). Because the trial judge is present and is an eyewitness to all the proceedings, the judge's action in denying the motion for new trial will not be disturbed unless it affirmatively appears from the entire record that the statements involved were prejudicial. Id.
In his written order denying Dr. Williston's post-judgment motions, the trial judge stated:
 "The court is of the opinion that [Dr. Williston] suffered no prejudice from the mention of insurance
by the hospital administrator. Firstly, it was inadvertent. . . . Secondly, at no time did the witness mention liability insurance. Thirdly, the court feels that it is naive to believe that a jury does not know that insurance may be involved in the case after the jury panels are qualified by the court as to [Dr. Williston's] insurance carrier."
(Emphasis added.)
Based on the foregoing, it is clear that the trial court found that the injection of insurance into the trial was an unsolicited, inadvertent reference that caused no prejudice to Dr. Williston. From our review of the entire record, we agree. Therefore, we hold that the trial court did not abuse its discretion in denying Dr. Williston's post-judgment motion on this issue.
 ISSUE III
Dr. Williston also maintains that the trial court erroneously refused to allow the testimony of Rosemary Hart, a special education coordinator in the Baldwin County school system. He proffered Hart's testimony as to the availability of programs in the Baldwin County School System for multi-handicapped children like Amanda. The trial court held that testimony as to any services provided by the Baldwin County Board of Education [was] subject to the collateral source rule and therefore inadmissible.
The collateral source rule provides that an amount of damages is not decreased by benefits received by a plaintiff from a source wholly collateral to and independent of the wrongdoer, including services provided by the state at government expense or decreased by institutionalization at government expense. SeeEnsor v. Wilson, supra, wherein this Court applied the collateral source rule to special education opportunities available to the plaintiff as of right.
Under the facts of this case, because Hart's testimony pertained to the special services available to Amanda through governmental sources, the trial court properly applied the collateral source rule.
Dr. Williston maintains that it was prejudicial error for the plaintiffs' counsel, in closing argument, to note Dr. Williston's failure to call any expert witness to counter the testimony of the plaintiffs' expert *Page 279 
witness, a special education specialist with the public school system in Houston, Texas, who gave her assessment and evaluation of Amanda and Amanda's needs for rehabilitative programs, including physical therapy, occupational therapy, and speech pathology.
From a review of the record, it is clear that the plaintiffs' counsel made no criticism of Dr. Williston for not calling a particular witness to testify as to a material matter, which is the basis for the general rule prohibiting a party from commenting on his opponent's failure to call a particular person. See Gamble, McElroy's Alabama Evidence § 191.01(1) (4th ed. 1991). Rather, it appears that the purpose of the closing argument of plaintiffs' counsel was to demonstrate to the jury that Dr. Williston had failed to present any evidence to dispute the plaintiffs' evidence concerning Amanda's needs and the cost of providing those needs.
The trial court did not err in denying Dr. Williston's motion for a new trial on this issue.
 ISSUE IV
Dr. Williston contends that the trial court erroneously admitted photographs of Amanda's condition before and after the injury and erroneously allowed an in-court demonstration of Amanda's physical disabilities and cognitive skills. He maintains that the cumulative effect of the photographs and the in-court demonstration was overwhelmingly prejudicial and far outweighed any probative value.
In Olympia Spa v. Johnson, 547 So.2d 80, 83 (Ala. 1989), this Court reiterated the general rule for the admission of photographs, stating as follows:
 " 'A photograph is relevant and admissible in order to explain and apply the evidence when it helps the jury to better understand the persons, objects, locale or conditions which are in issue.'
 "However, it remains within the sound discretion of the trial court to rule as to a particular photograph. The trial judge is vested with discretion not only in his determination as to the preliminary proofs offered to identify the photograph or to prove that the photograph is an accurate representation of the objects it purports to portray, but also in his determination of whether the picture will aid the jury or tend to confuse or prejudice it. The discretion of the trial court is not reversible in the absence of an abuse of that discretion."
(Emphasis added.) (Citations omitted.) See, alsoBucyrus-Erie Co. v. Von Haden, 416 So.2d 699 (Ala. 1982);Maffett v. Roberts, 388 So.2d 972 (Ala. 1980).
In this case, prior to trial, Dr. Williston filed a motion in limine to exclude an "A Day in the Life" video of Amanda and to require that Amanda be brought into the courtroom during voir dire so the venire could see Amanda and so he could ask the venire questions about Amanda's condition in order to eliminate jurors who might be biased or prejudiced because of her condition. The trial court granted Dr. Williston's motion, thereby excluding the video and requiring that Amanda be in the courtroom during voir dire examination. Furthermore, the trial court admitted only 3 of the 10 photographs offered by the plaintiffs to depict Amanda's condition prior to the injury and only 26 of the 40 photographs offered by the plaintiffs to depict her condition after the injury.
In its order denying Dr. Williston's post-judgment motions based on the claimed prejudicial effect of the photographs and the in-court demonstration, the trial court specifically found as follows:
 "The court finds and determines that [Dr. Williston] suffered no prejudice from the admission [of] numerous photographs showing the difference in [Amanda] before and after the incident. The court was careful to screen out repetitious views or those that create undue feelings on the part of the jurors. Likewise, the court is of the opinion that [Amanda] had a right to be in the courtroom under controlled conditions since it was her lawsuit. Moreover, the court had sustained [Dr. Williston's] objection to the day in the life video. In this court's opinion, the in-court demonstration *Page 280 was tasteful and instructive to the jury."
(Emphasis added.)
Based on the foregoing, and from an examination of the entire record and the photographs, we hold that the trial court did not abuse its discretion in admitting the photographs and the in-court demonstration.
 ISSUE V
In addition, Dr. Williston contends that the trial court erred in allowing the plaintiffs' counsel to cross-examine his expert witness, Dr. Russell Eubanks, concerning a matter that, Dr. Williston says, affected Dr. Eubanks's credibility. Dr. Williston also contends that the trial court erred in denying his motion for mistrial based on statements the plaintiffs' counsel made during closing argument about Dr. Eubanks's credibility.
The trial court has broad discretion as to the cross-examination of witnesses, and its exercise of that discretion is not reversible absent an abuse of discretion. See, Moon v. Nolen, 294 Ala. 454, 318 So.2d 690 (1975). See, also Mobile Cab Baggage Co. v. Busby, 277 Ala. 292,169 So.2d 314 (1964). In addition, the control of the closing argument is within the discretion of the trial court, which observes the demeanor of counsel, hears the remark in context, witnesses the effect on the jury, and can determine whether the remark was improper and had a prejudicial effect on the jury. See L.W.Johnson Assocs., Inc. v. Rivers Construction Co.,532 So.2d 618 (Ala. 1988); Yesterday's, Inc. v. Lamey, 492 So.2d 988
(Ala. 1986). In regard to the trial court's control of closing argument, unless the trial court abuses its discretion and thereby causes substantial prejudice, this Court will not interfere with the trial court's ruling. Id.
Without setting forth the specific portion of the cross-examination of Dr. Eubanks at issue or the remarks made about Dr. Eubanks during closing argument, we think it sufficient to say that we have examined the record and find no abuse of discretion by the trial court.
 ISSUE VI
Dr. Williston maintains that the cumulative effect of the errors alleged above entitles him to a new trial. Having held that the trial court ruled correctly as to each of those alleged errors, we hold that Dr. Williston's argument as to their cumulative effect is without merit.
 ISSUE VII
According to Dr. Williston, the only special damages the mother sought were for past expenses for the care of Amanda from the time of the injury to the date of the verdict and damages for loss of Amanda's services. He does not dispute that the evidence showed that the past medical expenses totalled $250,799.28, but he contends that no other "evidence whatsoever was introduced to assist the jury with respect to the value of the loss of services of [Amanda]." Therefore, he argues, since the record is devoid of any proof as to the value of Amanda's services, that portion of the $1,000,000 judgment for the mother that exceeds the proof of past medical expenses is due to be reversed and the case remanded for entry of a judgment consistent with the evidence.
The mother argues that she sought damages for past and future expenses for the care of Amanda and damages for loss of Amanda's services and that she presented sufficient evidence to support the $1,000,000 judgment.[2]
The trial court orally charged the jury, without objection, as follows:
 "Now, in this case, [Amanda] claims damages for the following types of damages. First, for permanent injuries, total disability and loss of future earning capacity, future medical, nursing, custodial care, and related expenses, past and future pain and suffering and mental *Page 281 
anguish and the other plaintiff in the case, [the mother], claims damages for the following elements: For the past medical, nursing, custodial care, and other related expenses — and when I say 'past,' I mean from the time of the alleged injury to the time that you reach a verdict. And the second element of damage that [the mother] is claiming is for loss of services of [Amanda]."
(Emphasis added.)
The following discussion occurred between the trial court and counsel for the mother to clarify what damages the mother was seeking and what damages Amanda was seeking:
 "The court: Does [the mother] have any exceptions or objections to the court's oral charge?
". . . .
 "The mother's counsel: [On] the question of future damages of Amanda Ard. Yesterday in your chambers we took the position that [the mother's] claim would be for past medical expenses and her loss services, past and future, but past medical expenses and care and what have you and that Amanda's would run from this date forward and that's kind of how our proof was geared. . . . All of our damages were for Amanda for a twenty-year life expectancy and that's the way we argued the case. . . .
 "The court: . . . I thought that was what I was doing.
 "[The mother's counsel]: . . . I thought you said that for future medical expenses for Amanda, you would consider those that ran from age nineteen on.
"The court: I did.
 "[The mother's counsel]: And you see where we would be, we would basically throw out ten years' worth of damages there because we hadn't — the claim for [the mother]. . . .
". . . .
 "The court: Now, let me get it straight. The damages for future — what?
 "[The mother's counsel]: Custodial, nursing, and medical care for Amanda would run from this date for the duration of her life expectancy.
". . . .
 "The court: Right. Part of Amanda's claim, from this date for the duration of her life expectancy as they find it to be.
". . . .
 "[The mother's counsel]: Past medicals and custodial and such care was the claim of [the mother] from the date of the incident to the present."
According to the trial court's oral charge to the jury on the mother's claim for damages and according to the colloquy between the trial court and the mother's counsel, it is clear that the only damages the mother sought were damages for past
expenses (medical, nursing, and custodial) for Amanda's care and for loss of Amanda's services. The jury cannot award damages contrary to the trial court's instruction, but is limited to the oral charge as given. See, e.g., Fraser v.Reynolds, 588 So.2d 442 (Ala. 1990).
In regard to the mother's claim for past expenses, it is undisputed that Amanda's past medical expenses totalled $250,799.28. Therefore, the issue before us is whether the mother proved damages for the loss of Amanda's services and for past nursing, custodial, and other related expenses in the amount of $749,200.72.[3]
As to the nursing care the mother rendered to Amanda from the date of the injury until the date of the jury verdict, the evidence clearly established that the mother is the primary caregiver for Amanda, whose needs are equivalent to those of a two-month old infant. The evidence also established that Amanda, who is entirely dependent on the mother, requires 24-hour care (which care includes dressing, bathing, brushing teeth, changing diapers, feeding through a tube every three hours, performing numerous range-of-motion exercises on Amanda's lower extremities, monitoring *Page 282 
Amanda's body for bedsores, and administering various medications at varying intervals during the day and night).
There is expert testimony that the value of the nursing care the mother provided Amanda was $83.50 per day. Although this testimony was presented to calculate the value of future nursing care for Amanda, a sum the mother could not claim because Amanda's claim was for future expenses, this figure could nonetheless be used to determine the value of the past nursing care the mother provided Amanda from the date of the injury until the date of the jury's verdict. The jury could have determined that the total value of the mother's past nursing care for Amanda, based on $83.50 per day from the date of the injury (January 30, 1986) until the date of the jury's verdict (April 19, 1991) was $159,067.50[4]
As to the mother's claim for loss of Amanda's services, in order for the mother to recover for the value of those services, the mother had to prove "not only that a loss occurred but also the reasonable value of the loss of those services 'measured by pecuniary standard.' " Hannon v. Duncan,594 So.2d 85, 93 (Ala. 1992), quoting Smith v. Richardson,277 Ala. 389, 171 So.2d 96 (1965). This she failed to do. In this case, as in Hannon v. Duncan, there was a complete lack of proof as to the value of services.
Based on the foregoing, we hold that because the mother failed to establish the value of Amanda's lost services, the jury's award was speculative to the extent that it exceeded the proof of past expenses incurred ($250,799.28 past medical expenses and $159,067.50 past nursing expenses), which expenses were properly shown. We therefore affirm the judgment for the mother but order a remittitur in the amount of the loss of services ($590,133.22), resulting in a judgment for the mother for $409,866.78.
 ISSUE VIII
Last, Dr. Williston maintains that the verdicts for the mother and Amanda were excessive and resulted from bias, prejudice, and passion on the part of the jury. Because we have already determined that the $1,000,000 judgment for the mother was excessive, we pretermit any further discussion on this issue as to the mother and resolve this issue only as it relates to Amanda.
The presumption of correctness of a jury verdict can be overcome only by a clear showing that the amount of the award is excessive. See General Motors Corp. v. Johnston,592 So.2d 1054 (Ala. 1992).
 " ' "The rules governing our consideration of [a claim that a verdict is excessive] are clear. . . . The verdict of a jury should not be interfered with merely because in the opinion of the Court the jury gave too little or too much . . .; and the authority vested in the courts to disturb a verdict on the ground of excessive damages is one which should be exercised with great caution . . .; where there is no set standard for the admeasurement of the damages but the damages to be awarded are left to the sound discretion of the jury, a remittitur or a new trial should not be ordered on the ground of excessiveness of the jury's verdict except in those cases where the Court can clearly see that the verdict has been reached on account of bias, passion, prejudice, corruption, or other improper motive or cause . . .; but where the damages allowed are so excessive as to warrant the belief that the jury must have been misled by some mistaken view of the merits of the case the court may interfere and set the verdict aside, . . . also, where the trial court refuses to grant a new trial because [it] does not believe the verdict to be excessive, the favorable presumption attending the jury's verdict is thereby strengthened. . . ." ' " *Page 283 
Olympia Spa, 547 So.2d at 88, quoting Vest v. Gay, 275 Ala. 286, 154 So.2d 297 (1963), as quoted in Black Belt Wood Co. v.Sessions, 514 So.2d 1249, 1264-65 (Ala. 1987).
In its order denying Dr. Williston's new trial motion, which had alleged that the verdicts were excessive, the trial court specifically found as follows:
 "This court has carefully considered the verdict in light of the Hammond factors. While the verdict is the largest compensatory award in the history of Baldwin County, the court finds that the award is not excessive in view of the damages suffered by
[the mother and Amanda]. Only God knows how long Amanda Ard will live, but she must have around-the-clock care for however long that may be. The jury award was well within the range of expert economic testimony."
(Emphasis added.)
The evidence clearly established that for the remainder of Amanda's life — she has a life expectancy of 54 years — the cost of the extensive care she will need is in excess of $3,000,000; the estimate of her lost wages is in excess of $400,000; and the value of the future nursing care now being provided for Amanda by her mother is in excess of $1,500,000. Based on this evidence, we agree with the trial court that the verdict for Amanda was not excessive.
Accordingly, the judgment for Amanda is affirmed; the judgment for the mother is also affirmed, conditioned upon the mother's acceptance of a remittitur of $590,133.22, as ordered by this Court.
AFFIRMED IN PART; AND AFFIRMED CONDITIONALLY IN PART.
HORNSBY, C.J., and MADDOX, SHORES, ADAMS, STEAGALL, KENNEDY and INGRAM, JJ., concur.
[1] South Baldwin Hospital, Dr. Rusty Reed, and Dr. E. Tyler Nichols were also named as defendants in this case. The jury returned a verdict in their favor, and the plaintiffs did not appeal from the judgment in their favor.
[2] We note that although the mother claims damages for loss of consortium, "loss of the society of a child as distinguished from the loss of [the child's] services, cannot form the element of recoverable damages." Hannon v. Duncan,594 So.2d 85, 93 (Ala. 1992).
[3] The jury returned a general verdict for the mother in the amount of $1,000,000. Subtracting the $250,799.28 leaves the disputed amount of $749,200.72
[4] From January 30, 1986, until April 19, 1991, is 5 years, 79 days, or 1905 days. $83.50 x 1905 = $159,067.50.